2005 WY 28

**WILLIAMS PRODUCTION RMT COMPANY, Appellant (Petitioner),**

v.

**STATE of Wyoming DEPARTMENT OF REVENUE, Appellee (Respondent).**

No. 04–41.

Supreme Court of Wyoming.

March 2, 2005.

Rehearing Denied March 29, 2005.

10.05. We conclude that the circumstances presented here do not warrant sanctions.

Representing Appellant: Scott P. Klosterman, Margo Harlan Sabec and Nicol M. Thompson of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Karl D. Anderson, Senior Assistant Attorney General; and Martin L. Hardsocg, Senior Assistant Attorney General, Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, JJ., and JAMES, D.J.

VOIGT, Justice.

[¶ 1]   This is a W.R.A.P. 12.09(b) certification of a petition for review of administrative action in which the underlying question is the point of valuation for severance tax purposes of coal bed methane gas.  We affirm the determination of the Wyoming State Board of Equalization.

## BACKGROUND

[¶ 2]   Barrett Resources Company (Barrett) began producing coal bed methane gas (CBM) in Campbell County, Wyoming, in 1999.  Williams Production RMT Company (Williams) is Barrett's successor in interest through merger.  CBM is subject to the severance tax imposed in Wyo. Stat. Ann. § 39–14–203 (LexisNexis 2003), the relevant portions of which read as follows:

(a) Taxable event.  The following shall apply:

(i) There is levied a severance tax on the value of the gross product extracted for the privilege of severing or extracting crude oil, lease condensate or natural gas in the state.  The tax imposed by this subsection shall be in addition to all other taxes imposed by law including, but not limited to, ad valorem taxes imposed by W.S. 39–13–101 through 39–13–111.

(b) Basis of tax.  The following shall apply:

(i) Crude oil, lease condensate and natural gas shall be valued for taxation as provided in this subsection;

(ii) The fair market value for crude oil, lease condensate and natural gas shall be determined after the production process is completed.  Notwithstanding paragraph (x) of this subsection, expenses incurred by the producer prior to the point of valuation

are not deductible in determining the fair market value of the mineral;

* * *

(iv) The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator.  When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter ˙ or processing facility, whichever occurs first;

(v) If the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection are sold to a third party, or processed or transported by a third party at or prior to the point of valuation provided in paragraphs (iii) and (iv) of this subsection, the fair market value shall be the value established by bona fide arms-length transaction[.]

Pursuant to Wyo. Stat. Ann. §§ 39–13–102(m)(i) and 39–13–103(b)(iv) (LexisNexis 2003), the same valuation is used for ad valorem tax purposes.

[¶ 3]   In 2001, the Wyoming Department of Audit (DOA) began an audit of Barrett's 1999 CBM production.  The audit was completed after Williams succeeded to Barrett's interests.  At the conclusion of the audit, the Department of Revenue (Department) determined that Williams owed an additional $170,747.15 in severance taxes, plus interest of $58,304.00, and the Department certified to Campbell County an increase in taxable value for ad valorem tax purposes of $3,392,635.00.  Williams paid the severance taxes under protest and filed a timely appeal with the Wyoming State Board of Equalization (Board) on September 23, 2002.  After a contested case hearing, the Board affirmed the Department's determination.  Williams then filed a petition for review in the district court pursuant to Wyo. Stat. Ann. § 16–3–114(a) (LexisNexis 2003).  The district court subsequently granted the Department's motion to certify the matter to this Court pursuant to W.R.A.P. 12.09(b), and this Court ac-

cepted certification on March 17, 2004. Oral argument was heard on October 4, 2004.

## ISSUES

[¶ 4]  We rephrase Williams' presented issues as follows:

1.  Whether the Board acted arbitrarily, capriciously, without substantial evidence, and in violation of the Wyoming Constitution when it held that Western Gas Resources' facility is not a processing facility and, therefore, the point of valuation for CBM is not located at the custody transfer meter?

2.  Whether the Board acted arbitrarily, capriciously, without substantial evidence, and in violation of the Wyoming Constitution when it held that the triethylene glycol dehydrator located in Western Gas Resources' facility is the initial dehydrator and, therefore, the point of valuation for CBM?

3.  If the Board is correct in determining that the legislature did not intend the oil and gas statutes in Wyo. Stat. Ann. §§ 39–14–201, *et seq.* (LexisNexis 2003), to apply to CBM, should CBM be taxed as an "other valuable deposit" under Wyo. Stat. Ann. §§ 39–14–701, *et seq.* (LexisNexis 2003)?

4.  Whether the Board acted arbitrarily, capriciously, without substantial evidence, and in violation of the Wyoming Constitution when it held that Williams is not entitled to deductions for all processing and transportation fees incurred downstream of the Department's selected point of valuation for Barrett's CBM?

5.  Whether the Board acted arbitrarily, capriciously, without substantial evidence, and in violation of the Wyoming Constitution when it held the assessment of interest on the alleged underpayment of taxes was proper?

[¶ 5]  We rephrase the Department's presented issues as follows:

1.  Whether the Board correctly affirmed the Department's determination that the point of valuation for Barrett's 1999 CBM production was the outlet of the triethylene glycol dehydrator pursuant to Wyo. Stat. Ann. § 39–14–203(b)(iv)?

2.  Whether the Board correctly affirmed the Department's determination that dehydrators or compressors, individually or in combination, did not comprise a "processing facility" pursuant to Wyo. Stat. Ann. § 39–14–203(b)(iv)?

3.  Whether the Board correctly affirmed the Department's determination that separators and compressors are not "dehydrators" pursuant to Wyo. Stat. Ann. § 39–14–201(a)(vii) and are not the "initial dehydrator" pursuant to Wyo. Stat. Ann. § 39–14–203(b)(iv)?

4.  Whether the Board correctly affirmed the Department's and the DOA's calculation of transportation expenses?

5.  Whether the Board reasonably concluded that Williams failed to sustain its burden of proving that the Department's calculation of transportation expenses was incorrect?

6.  Whether the Board correctly affirmed the Department's assessment of interest upon unpaid taxes?

## STANDARD OF REVIEW

[¶ 6]  Wyo. Stat. Ann. § 16–3–114 provides for judicial review of administrative agency action. In particular, Wyo. Stat. Ann. § 16–3–114(c)(ii) requires the reviewing court to "[h]old unlawful and set aside agency action, findings and conclusions found to be:"

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

■ [¶ 7]  We have held that "the substantial evidence test is the appropriate standard of review in appeals from [Wyoming Administrative Procedure Act] contested

case proceedings when factual findings are involved and both parties submit evidence." *Newman v. State ex rel. Wyoming Workers' Safety and Compensation Div.,* 2002 WY 91, ¶ 22, 49 P.3d 163, 171 (Wyo.2002). In addition,

> [w]hen we are reviewing cases [that] have been certified to us pursuant to W.R.A.P. 12.09(b), we apply the appellate standards [that] are applicable to a reviewing court of the first instance. *Hepp v. State ex rel. Wyoming Workers' Compensation Division,* 881 P.2d 1076, 1077 (Wyo.1994). When we are conducting our review,
>
> > "[o]ur task is to examine the entire record to determine whether substantial evidence supported the hearing examiner's findings. We will not substitute our judgment for that of the hearing examiner when substantial evidence supports his decision. Substantial evidence is relevant evidence [that] a reasonable mind might accept in support of the agency's conclusions."
>
> *Latimer v. Rissler & McMurry Co.,* 902 P.2d 706, 708–09 (Wyo.1995) (citations omitted).
>
> > "We do not, however, defer to an agency's conclusions of law. 'Instead, if the "correct rule of law has not been invoked and correctly applied, ... the agency's errors are to be corrected." ' *Thunder Basin Coal Company v. Study,* 866 P.2d 1288, 1291 (Wyo.1994) (quoting *Devous v. Wyoming State Board of Medical Examiners,* 845 P.2d 408, 414 (Wyo.1993))."
>
> *Celotex Corporation v. Andren,* 917 P.2d 178, 180 (Wyo.1996).

*JM v. Department of Family Services,* 922 P.2d 219, 221 (Wyo.1996). The burden of proving a lack of substantial evidence is upon the party appealing an agency's determination. *Mountain Fuel Supply Co. v. Public Service Com'n of Wyoming,* 662 P.2d 878, 883 (Wyo.1983). And specifically, the burden of proof with respect to tax valuation is on the party asserting an improper valuation. *Amoco Production Co. v. Wyoming State Bd. of Equalization,* 899 P.2d 855, 858 (Wyo. 1995) (quoting *Teton Valley Ranch v. State Bd. of Equalization,* 735 P.2d 107, 113 (Wyo. 1987)).

[¶ 8] "Statutory interpretation is a question of law and is reviewed de novo." *State ex rel. Wyo. Dept. of Revenue v. Powder River Coal Co.,* 2004 WY 54, ¶ 5, 90 P.3d 1158, 1159 (Wyo.2004).

> When interpreting statutes, we follow an established set of guidelines. First, we determine if the statute is ambiguous or unambiguous. A statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability. Unless another meaning is clearly intended, words and phrases shall be taken in their ordinary and usual sense. Conversely, a statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations. *Parker Land & Cattle Co. v. Wyoming Game & Fish Comm'n,* 845 P.2d 1040, 1042–43 (Wyo.1993).

*Powder River Coal Co.,* 2004 WY 54, ¶ 5, 90 P.3d at 1160.

## DISCUSSION

### *Point of Valuation*

[¶ 9] The fair market value of CBM for severance and ad valorem tax purposes is determined "after the production process is completed." Wyo. Stat. Ann. § 39–14–203(b)(ii). The present controversy arises from application of Wyo. Stat. Ann. § 39–14–203(b)(iv):

> The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first[.]

[¶ 10] Determining the point of valuation is of particular significance because "expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the [CBM.]" Wyo. Stat. Ann. § 39–14–203(b)(ii). Thus, because certain expenses "downstream" of the point of valuation *are* deductible, it is to

the producer's benefit to have the point of valuation determined "upstream" as far as possible. That is the instant case in a nutshell. Williams seeks an "upstream" point of valuation instead of the "downstream" point of valuation determined by the Department and confirmed by the Board.

[¶ 11] The progression of CBM from coal seam to commercial pipeline is a complex process involving extraction, gathering, processing, and transportation. Numerous separate activities occur throughout the process, including, as a result of CBM's association with water in the ground, dehydration. Barrett's CBM is gathered from separate wellheads in a spoke-and-wheel system of individual pipelines. The CBM passes through well meters at a central delivery point. Next, the CBM passes through a nearby custody transfer meter, where custody and possession is transferred to Western Gas Resources (Western). The CBM then flows through Western's initial transportation related compressor, and then through Western's low-pressure pipeline a distance of about five miles, where it then passes through Western's reciprocating compressors and a triethylene glycol (TEG) dehydrator. From that location, the CBM then enters either the Fort Union or the MIGC commercial pipeline.

[¶ 12] The Department has determined that the correct point of valuation for Barrett's CBM is at the outlet to the TEG dehydrator. Williams counters with two alternative theories: (1) if the TEG dehydrator is the "initial dehydrator" under Wyo. Stat. Ann. § 39–14–203(b)(iv), then the point of valuation should be at the custody transfer meter because the TEG dehydrator is located within a "processing facility;" and (2) the TEG dehydrator is not the "initial dehydrator" because dehydration also occurs within both the central delivery point and the initial transportation related compressor.

[¶ 13] The Board's Findings of Fact, Conclusions of Law, Decision and Order is a document containing 170 separate numbered paragraphs. (See Appendix A as attached).[1]

We have reviewed the findings and conclusions, along with the record citations contained therein, and we conclude that the Board properly affirmed the Department's determination that the point of valuation should be the outlet to the TEG dehydrator.

[¶ 14] Rather than reiterate all of the Board's findings that support its conclusion, we will simply note some of the findings and underlying facts we find to be significant. For instance, when Barrett first responded to the DOA concerning the upcoming audit, it identified no dehydrators in the system upstream from the TEG dehydrator and it made no reference to a "processing facility." Later, in response to a specific request from the DOA for information, Barrett replied that "[t]here are no dehydrators at the wells, the [central delivery points], or the compression stations." And during a later conference between DOA and Barrett representatives, Barrett specified that the dehydrator was located at the "booster station" after the "booster compressor." Judging from Williams' own schematic drawing of Barrett's system, this clearly indicates the TEG dehydrator. Even after the merger with Williams, Barrett employees identified to the DOA the TEG dehydrator as the initial dehydrator.

[¶ 15] When Williams' representatives took over dealings with the DOA, they perpetuated Barrett's position that the TEG dehydrator was the initial dehydrator. They added the contention, however, that the portion of Western's facilities where the TEG dehydrator was located was a "processing facility" and, therefore, inasmuch as dehydration took place within a processing facility, the point of valuation should be the inlet to the initial transportation related compressor. But significantly, Williams did not argue at the time that the initial dehydrator was anything other than the TEG dehydrator.

[¶ 16] The DOA did not accept Williams' theory that the described portion of Western's facilities was a "processing facility." In accepting the DOA's position, the Board de-

1. Appendix A does not contain the Board's signatures or the district court's file stamp because it was obtained electronically.

scribed the evidence upon which the DOA relied:

> 40. The auditors were not persuaded by this statement of position. For a variety of reasons, [the DOA representative] disagreed that the Barrett gas was processed.... Barrett had not reported a processing deduction on its state tax forms.... In a federal royalty audit, Barrett had reported the gas as unprocessed, and claimed no processing allowance.... The engagement letter had requested documentation of processing costs, but none was provided.... Barrett never provided any processing agreements or plant statements, nor were the auditors advised of a plant name or facility at which the gas was processed.... [The DOA representative] did not receive any construction and operating agreements. She did not receive settlement statements to indicate the segregation and sale of liquid natural gas products, or byproducts such as sulfur.... [The DOA representative] had previous experience with gas processing facilities such as Whitney Canyon. See *Union Pacific Resources Company et al*, Docket No. 2000–147, 2003 WL 21774603 (Wyo.St.Bd. Eq.). She had an understanding of typical gas processing facilities, and she saw no evidence of such facilities in this case.

[¶ 17] In addition to the observations of the DOA representative, the Board also relied upon a lengthy analysis whereby relevant statutory definitions and concepts were applied to Barrett's system, and it also gave deference to the Department's interpretation of a "processing facility" because such was not in conflict with legislative intent. We find that the Board's analysis, which is revealed in paragraphs 89–132 of the final order, that the TEG dehydrator was not located within a processing facility was a correct interpretation of the applicable statutes.[2] Williams argues essentially that because the TEG dehydrator performs some of the func-

tions listed in the definition of "processing" contained in Wyo. Stat. Ann. § 39–14–201(a)(xviii), *ipso facto*, it too is a processing facility. When the statutes are read *in para materia*, as we are required to do, that reasoning simply does not fly. As the Board noted in Conclusion # 122, Williams' approach relies on a circular reading of the statute that is not supported by its plain language. The first sentence of the definition limits any activity deemed to be processing to those occurring "beyond the inlet to a natural gas processing facility." Wyo. Stat. Ann. § 39–14–201(a)(xviii). In addition, the definition recognizes that some of the functions specifically listed may occur during production. In reality, the definition of processing is of little assistance in determining what the legislature meant by processing facility in the context of the severance tax statutes.

[¶ 18] However, we can look, as the Board did, to the definition of "natural gas" for purposes of taxation for some insight into the legislative intent as to what was meant by "processing" in this context. Wyo. Stat. Ann. § 39–14–201(a)(xv) provides that "[f]or the purposes of taxation, the term natural gas includes products separated for sale or distribution during processing of the natural gas stream including, but not limited to plant condensate, natural gas liquids and sulfur[.]" This language implies that the legislature understood processing would separate certain products from the natural gas stream. Thus a processing plant logically would be a facility constructed to perform the function of removing such products. The TEG dehydrator would not constitute such a facility.

[¶ 19] In addition, when construing technical terms contained within statutes, we look to the meaning ascribed to those terms in the applicable field. Wyo. Stat. Ann. § 8–1–103(a)(i) (LexisNexis 2003); *Amoco Production Co. v. State*, 751 P.2d 379, 382–83 (Wyo. 1988). A noted authority in the oil and gas

---

**2.** The Board also relied upon the testimony of witnesses from the DOA and the Department as to characteristics of processing facilities and the lack of those characteristics in the Western facilities. The "common understanding" of these witnesses was that there was "an identifiable universe of processing plants, such as Whitney Canyon, Painter, and Carter Creek." Clearly,

within the industry, the term "processing facility" has a specialized meaning beyond a collection of disparate pieces of equipment. The Board gave "heavier weight" to the fact that neither Barrett nor the DOA had referred to Western's facilities as a "processing facility," and further found this consistent with customary usage in the industry.

industry indicates that a processing plant is one that removes liquefiable hydrocarbons from wet gas or casing-head gas. Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* 833 (2003). This accepted meaning of the term "processing facility" within the industry most likely explains why neither Barrett nor Williams considered the TEG dehydrator to be a processing facility before attempting to achieve a more favorable point of valuation for their CBM production.

[¶ 20] It follows that, unless the TEG dehydrator was *not* the initial dehydrator, its outlet was the proper point of valuation. This conclusion, contained in the Department's final determination, apparently induced Williams to "prepare[ ] a new approach to the dehydrator definition." "Dehydrator" is defined at Wyo. Stat. Ann. § 39–14–201(a)(vii) as "a device which removes water vapor that is commonly associated with raw natural gas[.]" Williams' quest became to show that equipment in the central delivery points, as well as in the initial transportation related compressor, acted as dehydrators, which would make the appropriate point of valuation the custody transfer meter, rather than the TEG dehydrator.

[¶ 21] Williams hired Bret Rhinesmith to evaluate its theory. Rhinesmith's testimony at the contested case hearing revealed that "the function of removing water is ubiquitous in coalbed methane equipment and piping." The Board recited Rhinesmith's testimony that water vapor is separated from the CBM in the headers located in the central delivery points, that water vapor content of CBM decreases after passing through the screw compressor in the initial transportation related compressor, and that water removal occurs throughout the entire sequence of equipment from wellbore to the outlet of the TEG dehydrator.

[¶ 22] Citing to numerous pieces of technical evidence in the record, the Board found that, unlike the incidental separation of water and CBM in headers and compressors, and in the pipeline, itself, the TEG dehydrator is a specialized dehydrator—a particular piece of equipment. The Board found this significant

because of Wyo. Stat. Ann. § 39–14–203(b)(iv)'s location of the point of valuation at the outlet of the initial dehydrator—a piece of equipment—rather than at the initial place that any dehydration—a function—takes place. Once again, we find that the Board's interpretation of the statute to be consistent with legislative intent.

[¶ 23] Before going on to the next substantive issue, we will briefly discuss Williams' third stated issue, which questions whether the legislature intended CBM to be taxed as "oil and gas" under Wyo. Stat. Ann. § 39–14–201, *et seq.*, or as an "other valuable deposit" under Wyo. Stat. Ann. § 39–14–701, *et seq.* We conclude, for two reasons, that this is not actually an issue in this case. First, both parties agree that CBM is and should be taxed under Wyo. Stat. Ann. § 39–14–201, *et seq.* Second, Williams' query is founded on the apparent assumption that the Board determined that the legislature did not intend for CBM to be taxed under Wyo. Stat. Ann. § 39–14–201, *et seq.*, for which assumption we find no basis in the record. The Board did not even suggest that CBM should not be taxed under Wyo. Stat. Ann. § 39–14–201, *et seq.* Rather, in assessing statutory definitions, the Board merely considered the fact that CBM was not being commercially produced at the time the statutes were drafted. There is no substance to this issue.

### Deduction of Expenses

[¶ 24] Intertwined with Williams' point of valuation argument is a separate argument that the Department incorrectly determined allowable expense deductions. In consonance with its theory that the point of valuation was at the custody transfer meter, Barrett had deducted all costs associated with Western's services. The Department's determination that the correct point of valuation was the outlet of the TEG dehydrator required a recalculation of allowable expenses.

[¶ 25] Barrett paid Western $0.43 per mcf (one thousand cubic feet) of CBM for gathering and transportation to the point of sale.[3] Of that fee, $0.294 was paid pursuant

---

**3.** Although Western took possession of the CBM    at the custody transfer meters, Barrett identified

to a gas gathering agreement, and $0.14 was paid for transportation and other services on the MIGC pipeline, which was owned by Western. Barrett's reported taxable values reflected a transportation deduction for the expenses incurred between the custody transfer meters and the point of sale. In attempting to adjust these figures based on a point of valuation at the TEG dehydrator, the DOA several times requested from Williams a breakdown of the $0.294 per mcf fee but, without attempting to obtain the information from Western, Williams indicated that it could not provide such information.

[¶ 26] Eventually, the DOA decided that, of the $0.294 fee paid to Western under the gas gathering agreement, $0.084 would be allowed as a deduction for transportation from the outlet of the TEG dehydrator to the inlet of the MIGC pipeline. That figure was determined by reducing the $0.294 by the contractual rebate of $0.21 given by Western to match the lower rate charged by the parallel Fort Union pipeline. In addition, the DOA also allowed $0.14 per mcf for the fee to transport the CBM on the MIGC pipeline to the point of sale in Glenrock.

[¶ 27] Williams contends that these conclusions were not supported by substantial evidence and that the Board acted arbitrarily and capriciously. Williams argues that Barrett was statutorily entitled to deduct all transportation fees downstream of the Department's selected point of valuation, including fuel charges on the MIGC and Fort Union pipelines and all transportation fees incurred downstream of those pipelines. Further, Williams contends that the DOA's audit worksheets showed that the DOA acknowledged these fees and that the Department presented no evidence as to why such fees were not legitimate transportation deductions.

[¶ 28] The Board's refutation of Williams' position is partly based upon evidence supporting the position of the DOA and the Department, and partly based upon Williams' failure to meet its burden of proof. As with the point of valuation issue, we will not reiterate the Board's complete thought process, which is revealed in the attached Appendix A, particularly in paragraphs 16–17, 26, 32–33, 35, 37, 42–45, 73–79, and 148–162. We will, however, discuss some of the pertinent reasoning.

[¶ 29] After examining the record concerning the various charges previously deducted by Barrett, the Board made a specific finding noting the DOA's conclusion that Barrett had deducted both a gathering charge, paid to Western, and a transportation charge, paid to MIGC, and that the former cannot be deducted under Wyo. Stat. Ann. § 39–14–203(b)(iv) and (vi). In its findings, the Board then narrated the DOA's attempt to obtain from Williams information to allow a deduction for that portion of the Western charges that represented transportation costs from the outlet of the TEG dehydrator to the MIGC or Fort Union pipelines. The Board found that "Williams has offered no evidence in this proceeding that would enable the Department of Revenue or Department of Audit to disaggregate the Western fee." Despite noting further that the auditors could have disallowed any deduction for the Western expenses because Williams failed to provide information for that purpose, the Board nevertheless found that the DOA's decision to allow the $0.084 per mcf deduction was "a reasonable exercise of auditor judgment to reach a fair valuation for a taxpayer that refused to be cooperative." The DOA's rationale, approved by the Board, was as follows:

> Instead, the auditors determined that the total allowable transportation deduction would be $0.224, or $.084 more than the original allowance of $0.14 .... This number was reached by subtracting $0.21/MCF from the Western Gas Resource Fee of $0.294 .... The $0.21/MCF was inspired by the rebate Western gave to Barrett on gas shipped on the MIGC pipeline .... The auditors intended to allow transportation costs after the initial dehydrator, and broadly reasoned that all of Western's most expensive equipment was located before the outlet of the initial dehydrator .... They allocated approximately 70% of the fees charged by Western to service

a location at Glenrock, Wyoming, as being the     "point of sale."

between the custody transfer meter and the outlet of the glycol dehydrator. The auditors made no effort to account for fuel costs because fuel would be associated with the same equipment.

The Board also found that the administrator of the Department's mineral tax division "embraced this logic" given the unavailability of further information. And finally, the Board found inconsequential the Department's use of a $0.21/MMBTU rebate as "inspiration" for a deduction against a $0.294/mcf fee, given that the ultimate allowance of $0.084 was an estimate, not a precise calculation. As with earlier issues, we find that substantial record evidence supports these findings of the Board.[4]

■ [¶ 30] Williams' next major issue is the alleged failure of the DOA and the Department to allow deductions for transportation charges to points of sale downstream from Glenrock. The Board found that "the evidence supporting this conclusion is negligible." Specifically, the Board noted that Williams had not called any witnesses who could speak to possible sales beyond Glenrock, and also noted that this issue was not raised until after the final letters were sent by the DOA and the Department. Further, the Board found that the inferences of such sales contained in the testimony of Williams' representative were entitled to little weight because they were not supported by the evidence. Instead, the Board's findings relied upon the fact that the DOA had tied invoices to sales summaries in accepting Barrett's own representation that Glenrock was the point of sale.

[¶ 31] Not surprisingly, the Board's conclusions mirrored its findings as to these issues. The Board concluded that Williams had failed in its burden of going forward and in its burden of persuasion, meaning the burden never shifted to the Department to prove its determinations were correct. We affirm the conclusions of the Board in respect to this issue. The record evidence showing

Glenrock to be the point of sale included Barrett's own representations, as well as the auditors' findings based upon review of invoices and sales summaries. Evidence to the contrary consisted only of a Williams' witness's suggestion that the records showed "inferences" that such sales took place.

### Interest

■ [¶ 32] Wyo. Stat. Ann. § 39–14–208(c)(ii) provides for the collection of interest on delinquent severance taxes "when a taxpayer or his agent knew or reasonably should have known that the total tax liability was not paid when due[.]" Williams' position is that "Barrett did not and could not have predicted [the Department's] interpretation of the natural gas valuation and tax statutes would be so radically different from its own." Williams supports this position with references to the Department's refusal to supply a copy of an attorney general's memorandum regarding taxation of CBM, and to the Board's finding that the statutes are ambiguous. Finally, Williams claims that "[t]he obvious complexity of the issues surrounding the [point of valuation] for this 'new process' of natural gas production make it clear that it was reasonable for Barrett to interpret the statutes as it did and assessment of interest is inappropriate under these circumstances."

[¶ 33] The Board emphasized three points in affirming the Department's assessment of interest: First, Wyo. Stat. Ann. § 39–14–208(c)(iv) *requires* the assessment of interest on delinquent taxes. Second, in describing their own facilities and those of Western, no Barrett employee characterized the booster compressor and TEG dehydrator as a processing facility, and no Barrett employee identified more than one dehydrator. And third, no Barrett or Williams employee requested of the Department either a written interpretation of the statute or a value determination, both of which are available as a matter of right under Wyo. Stat. Ann. § 39–14–209(a).

---

4. There is some mixing of apples and oranges here. While the argument largely is presented as one of substantial evidence, Williams also argues that the Board acted arbitrarily and capriciously in finding that Williams had failed to meet its

burden of proving the Department's computation was incorrect. Because both parties submitted evidence, we have treated the issue primarily as being one of substantial evidence.

[¶ 34] Wyo. Stat. Ann. § 39–14–203(b)(iv) is quite clear in pronouncing that the natural gas production process is completed, for severance tax purposes, at the outlet of the initial dehydrator, unless no dehydration is performed other than within a processing facility. The record is just as clear that at no time did Barrett treat anything other than the TEG dehydrator as a dehydrator, and at no time did Barrett consider the TEG dehydrator as being part of a processing facility. In other words, Barrett's own knowledge and description of its and Western's facilities recognized that the point of valuation of the CBM was at the outlet to the TEG dehydrator. For Williams belatedly to argue otherwise was not reasonable and the Board certainly was free to discount the credibility of Williams' witness. Under these circumstances, the Department and the Board made no error of law in assessing interest. The Board's concession in its order that the statutory definitions of dehydrator and processing facility may be a "little ambiguous" in the CBM context is not sufficient to create confusion for Barrett that did not exist at the time it was reporting its production. We agree with the Board's conclusion that Barrett and Williams "simply failed to apply the plain language of the statute."

[¶ 35] Finally, we note that the attorney general's memorandum sought by Williams was the subject of a motion to compel discovery that resulted in a motion hearing and in camera review of the memorandum. The Board decided that the memorandum, which contained legal advice from the office of the attorney general to the Department in an unrelated case, was a privileged communication between attorney and client and was, therefore, not discoverable. In this appeal, Williams has shown us neither how that decision was legally incorrect nor how Williams may have been prejudiced by the ruling.

## CONCLUSION

[¶ 36] The Board's determination that the point of valuation of Barrett's CBM was at the outlet of the TEG dehydrator and its determination that the TEG dehydrator was not located within a processing facility were supported by substantial evidence. Interest was lawfully assessed against Barrett's delinquent taxes because both Barrett and Williams knew or should have known the proper point of valuation, inasmuch as the TEG dehydrator clearly was the initial dehydrator and it was not located within a processing facility within the meaning of the statute.

[¶ 37] Affirmed.

## APPENDIX "A"

## BEFORE THE STATE BOARD OF EQUALIZATION

## FOR THE STATE OF WYOMING

IN THE MATTER OF THE APPEAL OF

**WILLIAMS PRODUCTION RMT COMPANY**

FROM A PRODUCTION TAX AUDIT

ASSESSMENT DECISION OF THE

DEPARTMENT OF REVENUE

(Production Year 1999)

Docket No. 2002–103

## FINDINGS OF FACT, CONCLUSIONS OF LAW, DECISION AND ORDER

### APPEARANCES

Margo Harlan Sabec, Scott P. Klosterman, and Nicol M. Thompson, of Williams, Porter, Day & Neville, P. C., for Williams Production RMT Company, (Williams), successor in interest to Barrett Resources Company (Barrett).

Martin L. Hardscog, and Karl D. Anderson, Senior Assistant Attorneys General, for the Department of Revenue (Department).

### DIGEST

This matter came on for hearing on August 18 through 22, 2003, before the State Board of Equalization (Board), consisting of Roberta A. Coates, Chairman, Alan B. Minier, Vice Chairman, and Thomas R. Satterfield, Member. Gayle R. Stewart acted as Hearing Officer. All Board Members have considered this matter by attending the hearing,

reviewing the file, hearing transcript, and exhibits, and participating in this Decision and Order. This appeal arises from an audit of Williams' production of coal bed methane gas during 1999, and the Department's subsequent assessment of additional severance taxes and certification of increased value for ad valorem tax purposes.

## JURISDICTION

The Board must review final decisions of the Department of Revenue on application of any interested person adversely affected. *Wyo. Stat. Ann. § 30–11–102.1(c).* Taxpayers are specifically authorized to appeal final decisions of the Department concerning oil and gas valuation amendments. *Wyo. Stat. Ann. § 39–14–209(b)(v).* The taxpayer's appeal must be filed with the Board within thirty days of the Department's final decision. *Wyo. Stat. Ann. § 39–14–209(b)(iv); Rules, Wyoming State Board of Equalization, Chapter 2, § 5(a).* This case arises from the Department of Revenue's assessment of additional severance taxes and increase in taxable valuation on Petitioner's gas production following an audit by the Wyoming Department of Audit. *Wyo. Stat. Ann. § 39–14–208(b).*

## DISCUSSION

Williams Production RMT Company is the successor in interest to Barrett Resources Company. In 1999, Barrett produced coalbed methane from natural gas wells located in Campbell County, Wyoming. In 2001, the Wyoming Department of Audit (DOA), began an audit of Barrett's severance and ad valorem taxes. At the conclusion of the audit, the Department of Revenue determined that $170,747.15 of additional severance tax was due, together with interest in the amount of $58,304. The Department also certified a total increase of ad valorem taxable value of $3,392,635 to Campbell County.

Williams filed a timely appeal, identifying four errors:

1. The Department determined that Barrett's production process was completed, and therefore the point of valuation was located, at the outlet of a dehydration unit owned by Western Gas Resources.

2. The Department miscalculated the allowable transportation deduction.

3. The Department failed to exclude the total amount of exempt royalties from the taxable value of Barrett's 1999 production.

4. The Department assessed interest on the alleged underpayment of taxes.

We affirm the Department on all four issues. The dispute between the parties turns in large part upon the names and characterizations of equipment owned and used by Barrett, and equipment owned and used by Western Gas Resources, Inc. (Western), a company which provided services to Barrett for a fee. Generally speaking, the correct names of and characterizations of Barrett's and Western's equipment determine the point of valuation at which Barrett's gas is valued, and thereby affects the value of the gas. The case largely turns on the existence of a "dehydrator" and/or "processing facility." However, the positions of Barrett and Williams about names and characterizations varied considerably from the commencement of the audit to the conclusion of the hearing. In order to clearly demonstrate the record supporting our findings of fact and to reach the correct conclusions of law, we must pay attention to the details of the Barrett/Williams position over time.

## FINDINGS OF FACT

### Coalbed methane compared to conventional natural gas

1. Coalbed methane is produced from wells that are drilled into coal seams. These wells typically have a center tube through which water is pumped from the coal seam. The act of pumping off water reduces pressure on the coal, which liberates the natural gas from the coal seam. The gas enters an open-hole completion area, and flows to the surface through a production casing that surrounds the center tube. [Transcript Vol. I, pp. 73–74].

2. Generally speaking, coalbed methane differs from other natural gas produced in Wyoming. It is typically produced at lower pressure. It has lower flow rates per well.

Coalbed methane is not complex natural gas, that is, coalbed methane does not contains heavy hydrocarbons and has few impurities. [Transcript Vol. I, pp. 66–70]. Because coalbed methane does not have heavier hydrocarbons, there is no byproduct stream of natural gas liquids that can be used to generate revenue, nor any need to separate out oil or other liquid hydrocarbons. [Transcript Vol. I, pp. 71, 76].

3. Coalbed methane is in contact with water when produced, so the gas produced from the well is saturated with water. [Transcript Vol. I, p. 76]. The water vapor content of gas from a high pressure conventional well is approximately 100 pounds of water vapor per million cubic standard cubic feet a day of gas. [Transcript Vol. I, pp. 76–77]. The water vapor content of gas from a coalbed methane well is approximately 1000 pounds of water vapor per million standard cubic feet a day of gas, or about ten times more for the same volume of gas. [Transcript Vol. I, p. 77].

4. No party introduced precise information about industry-wide production of coalbed methane from the Powder River Basin of Wyoming, although such information is available from the Wyoming Oil and Gas Conservation Commission. [Transcript Vol. II, p. 292]. However, the parties agree, and we find, that coalbed methane production was not significant until the latter part of the decade of the 1990's. [Transcript Vol. II, pp. 292–293; Transcript Vol. IV, pp. 679–680]. The Petitioner's expert testified that, "1999 is probably the first year when things started ramping up." [Transcript Vol. II, p. 292].

### The audit of Barrett

5. In early 2001, the DOA commenced an audit of Barrett. Barrett had produced natural gas from coal bed methane wells in Campbell County, Wyoming, and paid severance and gross products taxes on that natural gas production. The period covered by the audit was 1999. Barrett commenced production in February 1999. [Transcript Vol. IV, p. 824; Exhibit 505].

6. Valerie Simmons, a principal auditor for the DOA, contacted Barrett in early 2001 to request documentation for an initial pre-audit review. William McGuire of Barrett sent the requested information to Simmons on January 10, 2001. [Exhibit 512]. McGuire's transmittal included three folders of material related to accounting, transportation, marketing, and gas purchase contracts, together with a map of the "[c]oalbed methane area showing well locations, PODS [central delivery points for the collection of gas from individual wells], Compressors and Pipelines." [Exhibit 512]. The transmittal made no reference to a dehydrator or processing facility.

7. McGuire's January 10, 2001, letter refers to agreements between Barrett (and a subsidiary) and a number of entities, including Western Gas Resources, Fort Union Gas Gathering, L.L.C., and MIGC. [Exhibit 512].

8. Barrett was a party to a "Gas Gathering Agreement" with Western Gas Resources, Inc., dated February 1, 1999. [Exhibit 144]. Under this Agreement, Western provided certain Gathering Facilities, defined as "including, but not limited to dehydration, pigging equipment, pipelines, metering facilities and compressors ..." [Exhibit 144, Article I Definitions]. Western took custody of the Barrett gas at a custody transfer meter located between Barrett's Central Delivery Points and a screw compressor owned by Western. [Transcript Vol. III, pp. 397–398]. Western was obliged to redeliver Barrett's gas to points of "interconnection of the facilities of [Western] and those of MIGC or of Fort Union, as applicable." [Exhibit 144, Article I Definitions; Transcript Vol II, p. 398].

9. MIGC is a pipeline that is regulated by the Federal Energy Regulatory Commission (FERC). The pipeline provides service from the terminus of Western's facilities to Glenrock, Wyoming. [Transcript Vol. III, pp. 435, 442]. On February 1, 1999, Barrett entered into an agreement with MIGC for service on a firm basis. [Exhibit 530]. On February 25, 1999, Barrett entered into an agreement with MIGC for service on an interruptible basis. [Exhibit 530].

10. Fort Union Gas Gathering, L.L.C. (Fort Union) is a pipeline, but it is not regulated by FERC. [Transcript Vol. III, p. 437] The rec-

ord includes a Firm Gathering Agreement between Fort Union and Bargath, Inc., dated March 1, 1999. [Exhibit 531]. Bargath was a subsidiary of Barrett. [Transcript Vol. III, p. 614]. Fort Union provided only limited service to Barrett during 1999. [Exhibit 507; Exhibit 140, showing Fort Union charges only in September 1999].

11. On February 9, 2001, Elwood Soderlind, Audit Supervisor for the DOA, sent a formal engagement letter to McGuire of Barrett. [Exhibit 505; Transcript Vol. IV, p. 824]. McGuire had been designated Barrett's audit contact. [Transcript Vol. IV, p. 825]. The engagement letter identified Simmons as DOA's contact. [Exhibit 505]. Among other things, the engagement letter requested, by February 28, 2001, comprehensive documentation for Barrett's 1999 coalbed methane production from Campbell County. The request encompassed volumes of gas produced, prices received, "costs (allowances) of processing, gathering, dehydrating, and transporting," gas sales contracts, tax workpapers, "a listing of actual government royalties paid", and "all gathering and transportation agreements and field schematics." [Exhibit 505].

12. On March 2, 2001, McGuire sent an e-mail to Simmons, explaining how Barrett calculated the volumes of production associated with each coalbed methane well. [Exhibit 502]. Simmons responded with a specific question about the presence of dehydrators "at the wellhead, the pod, or the compression station" because she knew "the statute was pretty clear about needing to know where that was." [Transcript Vol. IV, p. 833].

13. Tom Piecuch of Barrett responded to Simmons' request on March 5, 2001. [Exhibit 502]. He stated that, "There are no dehydrators at the wells, the pods or compressor stations. However, there is a water knock-out at the compressor stations." [Exhibit 502]. We find that a water knock-out is synonymous with a separator. [Transcript Vol. II, pp. 261–262; Vol. IV, pp. 689–690].

14. Representatives of Barrett and DOA, including McGuire and Simmons, met on May 1, 2001, for an opening conference. They discussed the tax audit and an audit of state and federal royalties. [Exhibit 507; Transcript Vol. IV., pp. 826–827]. The purpose of the conference was for the auditors to make sure that necessary information was available and to gain an understanding of the company, including deductions that were taken and who purchased production. [Transcript Vol. IV., p. 826]. Simmons made notes that are included in the audit file. [Transcript Vol. IV, pp. 828–829; Exhibit 507].

15. During the conference, Barrett employees described the sequence of the equipment between the wellheads and Glenrock, Wyoming. Four to twelve of Barrett's wells are served by a pod. At the pod, the gas is measured. From the pod, the gas goes to a Western screw compressor. From the screw compressor, the gas goes on to a booster compressor before entering a transportation pipeline to Glenrock. Simmons' notes state that, "[t]he dehydrator is located at the booster station and occurs prior to the booster compression." [Exhibit 507]. (This note was incorrect. The dehydrator is located after the booster compressor. [Transcript Vol. IV, p. 837].) Western owned the metering equipment and pipeline from the screw compressor to the main transportation line. [Exhibit 507].

16. During the conference, Barrett employees stated that Barrett paid Western a fee of approximately $0.43 per thousand cubic feet of gas (MCF) for all services necessary to move Barrett gas from Western's screw compressor to Glenrock, including the services of MIGC and Fort Union. [Transcript Vol. IV, p. 830; Exhibit 507]. The next day, Piecuch told Simmons that only $0.294 of the total fee paid to Western was for services provided by Western. [Transcript Vol. IV, p. 830; Exhibit 507]. The remainder of the total fee was for pipeline services. There was charge of $.014 per MCF for gas sent on the Fort Union pipeline. [Transcript Vol. IV, p. 830; Exhibit 507]. Barrett's price to Glenrock was essentially equal via either Fort Union or MIGC, however, because Western provided a rebate against MIGC's FERC-tariffed rate to match the Fort Union rate. [Transcript Vol. IV, p. 830; Exhibit 507].

17. Barrett deducted from its taxes all of the charges billed by Western. [Exhibit 507]. Barrett deducted these charges as transportation expenses against Barrett's total revenues from the Powder River Basin, allocated to the well level based on the production volume of each well. [Transcript Vol. II, pp. 391–392].

18. During the conference Barrett employees told the auditors that Barrett sold its gas to Western at the screw compressor, then Barrett repurchased the gas at Glenrock, where Barrett marketed the gas. [Exhibit 507; Transcript Vol. IV, p. 831]. However, the auditors could see that the sale to Western was not the ultimate sale. [Transcript Vol. IV, p. 831]. Sales invoices provided by Barrett did not give a specific detailed location of where sales occurred. [Transcript Vol. IV, p. 831].

19. Barrett later represented that the point of sale for its coalbed methane gas was Glenrock, and the auditors were able to tie invoices to sales summaries that Barrett provided. [Transcript Vol. IV, p. 831]. The auditors accepted Barrett's representation of the point of sale [Transcript Vol. IV, p. 932], and so do we. We find that the point of sale was Glenrock, Wyoming. This finding is supported by Barrett's deduction of the charges billed by Western, which implicitly reflects Barrett's position on (a) the point of valuation, i.e., the custody transfer meter between Barrett's pod and Western's screw compressor, and on (b) the point of sale, i.e., Glenrock.

20. On May 7, 2001, Barrett accepted a bid from Williams to acquire Barrett. [Transcript Vol. II, p. 359]. Simmons received notice of the pending merger on May 14, 2001. [Transcript Vol. V, p. 878]. The merger closed in two steps. Williams bought fifty percent of the stock of Barrett in a transaction that closed on June 11, 2001. Williams acquired the balance of Barrett stock in a stock trade which closed on August 1, 2001. [Transcript Vol. II, pp. 359–360].

21. On June 14, 2001, Simmons and three other auditors took a field tour of Barrett facilities in Campbell County. [Transcript Vol. IV, p. 836]. The auditors had requested the tour because they were new to coalbed methane audits. The tour was arranged through an audit contact at Barrett and as part of the audit process. [Transcript Vol. IV, pp. 832, 844]. Nathan Lopez conducted the tour; Lopez was an operations superintendent for Barrett. [Transcript Vol. IV, p. 836]. Simmons was specifically interested in learning "where the initial [dehydrator] was because that was key in the point of valuation decision." [Transcript Vol. IV, p. 837].

22. Simmons took notes of the trip. Her notes memorialize the terms Lopez used to describe the equipment. [Exhibit 537; Transcript Vol. IV, pp. 837–838, 840]. Lopez showed the auditors several wells, and three different pods. [Transcript Vol. IV, pp. 839–840; Exhibit 537]. Lopez showed the auditors two booster compressor stations. [Transcript Vol. IV, pp. 839–840; Exhibit 537]. Lopez stated that there were two different equipment configurations. With three stage compressors, the gas went from the wellhead to a pod, from the pod to a screw compressor, from the screw compressor to a booster compressor, from the booster compressor to a dehydrator, and from the dehydrator to the pipeline. With four stage compressors, the gas went directly from the pod to a booster compressor, but the sequence was otherwise the same. [Transcript Vol. IV, pp. 839–841; Exhibit 537].

23. Lopez showed Simmons a dehydrator in a building. The dehydrator came after a booster compressor. [Transcript Vol. IV, pp. 840–841]. Lopez described the dehydrator to Simmons as a glycol dehydrator. [Transcript Vol. IV, p. 841].

24. Once the merger with Barrett closed on August 1, 2001, Williams decided to consolidate Barrett's accounting functions from Denver to the Williams home office in Tulsa. [Transcript Vol. II, p. 360]. Williams did not offer McGuire a position after the merger. [Transcript Vol. II, p. 362]. Piecuch accepted a job with Williams, but Williams severed Piecuch in November of 2001. [Transcript Vol. II, p. 363]. At the hearing of this matter, Williams did not provide testimony from McGuire, Piecuch, Lopez, or any other former Barrett employee having personal

knowledge of Barrett's policies or practices with respect to accounting, contracts administration, sales, or operations.

25. In August 2001, Williams Exploration and Production gave Greg Storts the responsibility to report Wyoming severance, conservation, and gross products taxes, as well as Wyoming state royalty. [Transcript Vol. II, pp. 385, 387].

26. On October 11, 2001, Simmons entered a memorandum in the audit file. She memorialized her preliminary conclusion that Barrett had deducted both a gathering charge, paid to Western, and a transportation charge, paid to MIGC. [Exhibit 517]. Generally speaking, gathering charges relate to services provided prior to the point of valuation, and cannot be deducted. *Wyo. Stat. Ann. §§ 39–14–203(b)(iv), 39–14–203(b)(vi).*

*Williams reviews Barrett's point of valuation*

27. On October 29, 2001, Storts attended a seminar hosted by the Wyoming Department of Revenue. [Transcript Vol. II, p. 392]. The seminar was designed to instruct mineral taxpayers on how to correctly fill out the different forms associated with the Mineral Tax Division. [Transcript Vol. II, p. 392]. The seminar prompted Storts to review Barrett's calculation of taxable value. [Transcript Vol. II, p. 393]. According to Storts, "Williams had been told that Barrett was using the custody transfer meter as the point of valuation." [Transcript Vol. II, p. 394].

28. Storts reviewed the appropriate Wyoming statutes, and contacted Dean Tinsley, an engineer in Barrett's Denver offices, to learn about Barrett's coalbed methane operations. [Transcript Vol. II, pp. 393–394].

29. Tinsley advised Storts that the field layout "went from the well to the POD to the screw compressor to the [reciprocating] station and then into the pipelines." [Transcript Vol. III, p. 598]. Tinsley also explained such details as "what a screw compressor was and where it was located in the system." [Transcript Vol. III, p. 599].

30. Storts then reached a conclusion based on his own reading of the Wyoming statutes.

[Transcript Vol. II, p. 394]. Storts saw that there was no statutory definition of "processing facility," but decided that a processing facility must be a facility where processing occurred. Storts then analyzed Western's facilities in light of the statutory definition of "processing." [Transcript Vol. II, p. 395]. Based on what Tinsley had told him about the Western facilities, Storts concluded that Western's facilities were a processing facility. [Transcript Vol. II, pp. 395–396]. Storts then consulted the portion of the statute that identifies the point of valuation for processing facilities, and concluded that the point of valuation was the custody transfer meter. [Transcript Vol. II, pp. 394–396].

31. Prior to this time, no one from either Barrett or the DOA had referred to the Western's facilities as a "processing facility." We find that the previous usages are entitled to heavier weight, particularly with respect to the customary usage in the industry.

*The Preliminary Issue Letter and Williams' Response*

32. On April 17, 2002, the DOA sent its Preliminary Issue Letter to Williams. [Exhibit 101]. The purpose of the letter was to identify preliminary findings, and to give the audited party a chance to address the findings. [Transcript Vol. IV, p. 847]. The letter identified only two issues. The first issue was incorrect calculation of new gas well tax incentives. [Exhibit 101]. Williams accepted this audit finding. [Transcript Vol. II, p. 392].

33. The second issue was the transportation deduction claimed by Williams. The auditors stated that:

> After careful review of the transportation/gathering information provided by Barrett Resources Corporation during the audit, we have determined that the allowable transportation charge is $0.14/MCF. Barrett Resources Corporation may wish to furnish additional information regarding the breakdown of all charges incurred to move the gas from the wellhead to the ultimate sales point.

[Exhibit 101]. The letter stated that a response was due by May 17, 2002. [Exhibit 101].

34. When Williams received the Preliminary Issue Letter, Storts took over as the audit contact for Williams. [Transcript Vol. II, p. 400].

35. By the time the DOA sent the Preliminary Issue Letter, the auditors had concluded that the correct point of valuation was in the outlet of Western's glycol dehydrator. [Transcript Vol. IV, p. 850]. The auditors were prepared to allow a deduction for the portion of the Western charges associated with Western's pipeline connection from the glycol dehydrator outlet to the inlet of the MIGC or Fort Union pipeline. The auditors had not made such an allowance because they had no information about those costs. [Transcript Vol. IV, p. 852].

36. Williams responded to the DOA by letter of May 16, 2003. Margo Sabec, outside counsel for Williams, wrote the response. [Exhibit 503]. The letter is significant because it states additional details of fact; it ties those details to a legal position; and it conflicts with facts and positions later taken by Williams. The letter proceeds on the premise that the Department has disallowed fees related to the services provided by Western. [Exhibit 503].

37. Sabec asserted the following facts, among others, and in doing so supplemented the positions previously taken by Barrett employees:

a. Gas "from individual wells was gathered from the wellhead to a central delivery point ("CDP") in Barrett's separate and individual pipelines....The CDP is sometimes referred to as the pod house."

b. At the CDP, the commingled gas flowed "through a separator that allowed the gas to separate from the water it was produced with."

c. "The commingled gas was transported in Barrett's pipelines downstream from the CDP to a custody meter, where custody and possession of the gas was transferred to a third party transporter (Western)."

d. "....Western charged Barrett a fee of $0.32/MCF, including fuel, to transport and process its gas on Western's pipeline system."

e. "....The inlet of the initial screw compressor was located immediately downstream of the custody transfer meter...."

f. "....Fort Union and MIGC charged Barrett a fee or rate of $0.14/MCF to transport and process its gas from the inlet of their pipeline systems downstream to the interstate transportation hub."

g. "....Barrett did not sell its natural gas at or prior to the point of valuation by bona fide arm's length sale during production year 1999."

[Exhibit 503]. In reference to paragraph d above, we find that $0.32/MCF referred to the $0.294/MCF fee for services provided only by Western, to which Sabec added a maximum fuel charge. In reference to paragraph f above, we find that $0.14/MCF referred imperfectly to the fact that Western provided Barrett a rebate of $0.21/MMBTU of gas to provide a pipeline rate to Barrett that was essentially the same no matter which one of the two pipelines was used to move Barrett's gas to Glenrock. [Transcript Vol. III, p. 434]. Referring to paragraph g above, we note that Sabec said nothing to repudiate the point of sale previously represented by Barrett's employees.

38. Sabec also asserted positions that mixed facts with statutory characterizations:

a. "On its pipeline system, Western performed processing functions to Barrett's and other third party gas at screw compressors (boost the pressure of the gas to approximately 80 psi), reciprocating compressors (boost the pressure to approximately 1,400 psi), and dehydrators...."

b. "....The inlets to the Fort Union or MIGC pipeline systems are located downstream of Western's processing facility (where compression and dehydration are performed)."

c. "....Barrett reported that its production process was completed at the inlet to the initial transportation related compressor (the screw compressor)...."

d. "....Barrett's gas had been extracted and severed from the ground and gathered from multiple wells via Barrett's separate pipelines to a central point of accumulation (CDP), where separation and water removal occurred. *There was no dehydration,*

*as it is defined in the statutes, performed by Barrett in the production process . . . .* " (emphasis supplied) [Exhibit 503].

39. Williams' key point was that the Barrett gas was dehydrated within a processing facility that belonged to Western. Like Storts individually, Williams concluded that Barrett had correctly selected the inlet of the initial transportation related compressor as the point of valuation. Williams cast its lot with the definition of point of valuation found in the second sentence of Wyo. Stat. Ann. § 39-14-203(b)(iv): "Where no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first." Williams accordingly concluded that it was entitled to deduct all of the fees charged by Western. [Exhibit 503].

40. The auditors were not persuaded by this statement of position. For a variety of reasons, Simmons disagreed that the Barrett gas was processed. [Transcript Vol. IV, p. 859]. Barrett had not reported a processing deduction on its state tax forms. [Transcript Vol. IV, p. 860]. In a federal royalty audit, Barrett had reported the gas as unprocessed, and claimed no processing allowance. [Transcript Vol. IV, p. 860]. The engagement letter had requested documentation of processing costs, but none was provided. [Transcript Vol. IV, p. 860]. Barrett never provided any processing agreements or plant statements, nor were the auditors advised of a plant name or facility at which the gas was processed. [Transcript Vol. IV, p. 860]. Simmons did not receive any construction and operating agreements. She did not receive settlement statements to indicate the segregation and sale of liquid natural gas products, or byproducts such as sulfur. [Transcript Vol. IV, pp. 861-862]. Simmons had previous experience with gas processing facilities such as Whitney Canyon. See *Union Pacific Resources Company et al,* Docket No. 2000-147, 2003 WL 21774603 (Wyo.St. Bd.Eq.). She had an understanding of typical gas processing facilities, and she saw no

evidence of such facilities in this case. [Transcript Vol. IV, p. 861].

41. Williams sought and received an audit conference. [Transcript Vol. II, p. 403]. The conference was held on June 13, 2002. [Transcript Vol. IV, p. 853]. At this conference, the auditors stated their position that the point of valuation was at the outlet of the initial dehydrator [Transcript Vol. IV, pp. 851-852]; we find the testimony of Simmons more credible than contrary testimony of Storts that the auditors did not do so. [Transcript Vol. II, p. 405]. Williams discussed its view about the existence of a processing facility, and about what processing functions occurred at Western's facilities. [Transcript Vol. II, p. 404]. During the conference the auditors asked for a breakdown of the $0.294 Western charges, in order to allow a portion of the charges. [Transcript Vol. IV, p. 852].

42. On June 25, 2002, Simmons spoke again with Storts about a breakdown of the Western fee. [Exhibit 510]. Storts told her that Williams did not have a way to break the fee down. [Exhibit 510]. On July 9, 2002, Storts reiterated this position in an e-mail to Simmons, stating that, "Since this is a 3rd party, arms-length contract, Williams has no information regarding any breakdown of the fixed charge, as it relates to separate functions performed or segments of the Western Gas Resources system." [Exhibit 513]. However, Storts concedes that Williams did nothing to see if a breakdown was available from Western. [Transcript Vol. III, p. 508]. Williams management chose not to contact Western. [Transcript Vol. III, p. 509]. We find that Williams has offered no evidence in this proceeding that would enable the Department of Revenue or Department of Audit to disaggregate the Western fee.

*The Final Issue Letter and the Department of Revenue's Determination*

43. On July 25, 2002, Simmons wrote a memo to the file to reflect that the auditors had modified the allowable transportation deduction. The auditors added a deduction value for the transport of gas from the outlet of the initial dehydrator to the inlet of the MIGC pipeline. [Exhibit 518]. We note

that the auditors could have disallowed any Western expense because Williams did not come forward with information. [Transcript Vol. V, p. 898]. Instead, the auditors determined that the total allowable transportation deduction would be $0.224, or $.084 more than the original allowance of $0.14. [Exhibit 518]. This number was reached by subtracting $0.21/MCF from the Western Gas Resource Fee of $0.294. [Exhibit 518]. The $0.21/MCF was inspired by the rebate Western gave to Barrett on gas shipped on the MIGC pipeline. [Exhibit 518]. The auditors intended to allow transportation costs after the initial dehydrator, and broadly reasoned that all of Western's most expensive equipment was located before the outlet of the initial dehydrator. [Transcript Vol. IV, pp. 866–867]. They allocated approximately 70% of the fees charged by Western to service between the custody transfer meter and the outlet of the glycol dehydrator. The auditors made no effort to account for fuel costs because fuel would be associated with the same equipment. [Transcript Vol. IV, p. 863]. We find that this was a reasonable exercise of auditor judgment to reach a fair valuation for a taxpayer that refused to be cooperative.

44. On August 23, 2002, the Department sent Williams a final determination assessment notice. [Exhibit 500]. This notice stated the amount of severance tax underpayments including interest, and notified Williams of additional taxable value for ad valorem tax purposes. [Exhibit 500]. The Department determination was accompanied by a final issue letter to Williams from the DOA. [Exhibit 501]. The DOA's final issue letter adopted the rationale expressed by Simmons in her July 25 memorandum, with this explanation:

> ... [W]e consider the Western Gas Resource Fee of $.294/MCF less the $.21/MCF rebate, or $.084/MCF, as the allowable transportation deduction from the outlet of the **dehydrator** to the inlet of the main transmission line, and any charges prior to the outlet of the **dehydrator** are considered gathering and therefore deemed unallowable. The MIGC Fee of $.14/MCF to transport gas from the inlet

of the main transmission line to market has been deemed an allowable transportation deduction. Therefore, the total allowable transportation deduction is the $.084/MCF charge plus the $.14/MCF charge, or $.224/MCF. (Emphasis supplied).

[Exhibit 501].

45. Randy Bolles, Administrator of the Mineral Tax Division of the Department of Revenue, testified that the Department embraced this logic, despite being aware of the limits of the information available. [Transcript Vol. III, pp. 736–744]. For Bolles, the key points were the total cost of $0.434/MCF, and the unavailability of information that would allow anyone to precisely allocate the cost of Western's services [Transcript Vol. III, pp. 736–744]. Bolles stated that, "we did, I think, the best we could do with the information we had to determine this piece . . . . of that fee." [Transcript Vol. III, p. 741].

46. Williams paid the severance taxes under protest [Exhibit 104], and filed a timely appeal on September 23, 2002. [Board Record].

### Williams prepares a new approach to the dehydrator definition

47. On review of the final issue letter, Williams took particular notice of the DOA's reliance on the first sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv): "The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of **the initial dehydrator.**" (emphasis supplied) [Transcript Vol. III, pp. 418–424]. Williams also directed its attention to the definition of "dehydrator" in Wyo. Stat. Ann. § 39–14–201(a)(vii): " 'Dehydrator' means a device which removes water vapor that is commonly associated with raw natural gas." [Transcript Vol. III, pp. 423–424]. Williams reasoned that if the equipment in the CDP were a dehydrator, or the screw compressor were a dehydrator, then the point of valuation would be at or near the custody transfer meter, whether or not Western's equipment constituted a processing facility. [Transcript Vol. III, p. 425].

48. Williams hired Bret Rhinesmith to determine whether water vapor was removed

from the Barrett gas by equipment other than the glycol dehydrator. [Transcript Vol. III, pp. 424, 551–552]. Rhinesmith's testing demonstrated that the function of removing water is ubiquitous in coalbed methane equipment and piping. We find that water removal started in the wellbore itself and continued along the entire sequence of equipment to the outlet of the glycol dehydrator.

49. Unfortunately, Rhinesmith insisted on adding the name, "dehydrator," to the equipment he tested. [E.g., Exhibit 112, depicting a piece of equipment identified as "Initial dehydrator: stacked vertical type dehydrator"]. By doing so, Rhinesmith confused the results of his functional analysis with the application of statutory terms, although he insisted that he had no such intention. [Transcript Vol. II, pp. 207–208]. We therefore make findings that disentangle the functional analysis from the application of statutory terms.

50. Within each central delivery point, or pod, there is a cylindrical vessel, into which gas flows via pipes from individual wells. We find that this vessel is a "header," based on a standard dictionary definition [Webster's New World College Dictionary, 4th Edition (2001), p. 655], on the language used in a patent [Exhibit 116, "Multiple Well Header System for Collection of Methane Coal Gas"], and on Rhinesmith's testimony [Transcript Vol. II, p. 299, "a header is a device that . . . . commingles streams"].

51. The headers in coalbed methane pods are not used in the production of conventional natural gas; they are devices specifically designed for coalbed methane production. [Transcript Vol. I, pp. 99–100; Vol. II, p. 271]. The volume of gas produced from individual coalbed methane wells is relatively low, and the wells are somewhat closely spaced, so it is both useful and efficient to route the production from several wells to a single point. [Transcript Vol. I, p. 99; Transcript Vol. II, p. 283]. The pressure of gas from the individual wells is also low, so it is not necessary for headers to be code stamped pressure vessels, that is, they are not built under the American Society of Mechanical Engineers boiler and pressure ves-

sel code. [Transcript Vol. I, pp. 100, 302]. However, the gas pressure is high enough so that the gas normally flows into and through the header under its own pressure. [Transcript Vol. I, pp. 99–100, 300].

52. Rhinesmith tested four different types of headers, which he classified as stacked vertical, vertical, slanted, and horizontal. [Transcript Vol. I, p. 98]. These headers were in four different locations [Transcript Vol. I, p. 85], corresponding to operating locations of the principal coalbed methane producers in the Powder River Basin. [Transcript Vol. II, p. 293; Exhibit 107].

53. Barrett's header was a vertical stacked header. [Transcript Vol. I, p. 118]. The design of this header was explained by a patent that was admitted into evidence. [Exhibit 116; Transcript Vol. I, p. 119]. However, with respect to removing water from the gas stream, all four types of headers functioned in essentially the same way. [Transcript Vol. II, p. 310].

54. Gas from the individual wells enters the body of the header, then the gas expands due to the larger space. [Transcript Vol. I, p. 120]. With expansion, the pressure of the gas drops, and the gas cools. [Transcript Vol. I, p. 120]. As the gas cools, water vapor in the gas stream condenses and falls to the bottom of the header, where water drains off. [Transcript Vol. I, p. 120]. There is also liquid water that reaches the header through the pipes from individual wells. [Transcript Vol. I, p. 120; Vol. II, p. 300].

55. The patent on the header consistently refers to the header's action on water vapor as separation:

. . . . The inclined header receives the raw methane coal gas from the separate pipes and the **separation of water vapor from the gas** is expected to occur in the inclined head merely due to the force of gravity on the heavier water vapor. Heretofore, **water vapor separation** has been both inefficient and incomplete in this prior art collection system based on the use of inclined collection heads . . . .

. . . . gas entrained with water vapor . . . . enters the interior chamber of the header through the inlet pipes **where the**

**water vapor being heavier than the gas separates from the gas** and falls to and condenses above and within the water collection area of the header whereas the gas rises to the upper end of the header ...

[Exhibit 116, p. Williams/Barrett 0047](emphasis supplied)

56. In tests on the Barrett header, Rhinesmith found that the header removed 17.66 pounds of water vapor per million standard cubic feet a day of gas. [Transcript Vol. I, p. 123]. The test results on the other headers ranged from 14.24 pounds to 114.34 pounds of water vapor per million standard cubic feet a day of gas. [Transcript Vol. II, p. 304]. Rhinesmith confirmed these results with a computer simulation which showed that 28.67 pounds of water vapor per million standard cubic feet a day of gas would be removed in a header. [Transcript Vol. I, pp. 157–160; Exhibit 129].

57. From an engineering perspective, the principles at work in the header are not limited by size. [Transcript Vol. II, p. 301]. One could construct and insert a smaller vessel next to the well head, and achieve water removal by condensation. [Transcript Vol. II, p. 302]. Moreover, Rhinesmith testified that water is lost by condensation in the well bore itself. [Transcript Vol. I, p. 252].

58. Rhinesmith conducted field testing for water vapor content at a screw compressor located in facility unrelated to Barrett. [Transcript Vol. I, pp. 164–165]. Rhinesmith took measurements before the inlet to the screw compressor, and beyond the outlet of a cooling unit just after the screw compressor. [Transcript Vol. I, pp. 164–165]. He found a change in water vapor content of 65.43 pounds of water vapor per million standard cubic feet of gas per day [Transcript Vol. I, pp. 164–165], although the resulting water is "removed in downstream processes," not at the location of the screw compressor. [Transcript Vol. I, p. 165; Vol. II, p. 263]. Rhinesmith again confirmed his field results with a computer simulation; his model showed the removal of 118.1 pounds of water vapor per million standard cubic feet of gas per day. [Transcript Vol. I, pp. 165–167; Exhibit 132].

59. Water was removed from the sequence of equipment at separators located in advance of the booster compressor, and at coolers located after the booster compressors. [Transcript Vol. I, pp. 171–174]. Rhinesmith conducted a computer simulation that, when adjusted to be expressed consistent with the other results, showed 165.52 pounds of water vapor per million cubic feet of gas coming into the booster compressors, which left about 100 pounds of water vapor to be removed by the glycol dehydrator. [Transcript Vol. II, pp. 315–319; Exhibit 134].

60. We find that removing this last 100 pounds of water vapor per million standard cubic feet a day of gas by glycol dehydrator is crucial to rendering the gas suitable for pipeline transport. [Transcript Vol. I, pp. 179–186].

61. The triethylene glycol dehydrator employs absorption, not condensation, to remove water. [Transcript Vol. I, p. 108]. It includes a number of pieces of equipment. [Transcript Vol. I, p. 226]. Unlike the header, the TEG contactor vessel is usually "code stamped because of the pressures at which it's operating." [Transcript Vol. II, p. 303]. Rhinesmith testified that there is no dehydrator in the computer simulation he uses. Instead, the glycol dehydrator function is simulated by use of a series of component functions. [Transcript Vol. II, p. 322]. These functions include an absorber; a separator to model filtration; a two-part force used to drive the glycol pump; a heat exchanger; a distillation operation, including a reboiler; a pump to return the glycol to the TEG contactor; another heat exchanger, to cool the glycol and warm the dry natural gas; and a recycle function. [Transcript Vol. II, pp. 322–324]. We find that these functions fairly reflect the workings of the glycol dehydrator.

62. The glycol dehydrator reduces the presence of other components of the coalbed methane, such as carbon dioxide. [Transcript Vol. I, p. 186; Exhibit 136]. Speaking generally, coalbed methane does not include volatile organic compounds, so the minor components removed by the glycol dehydrator are vented to the atmosphere. [Transcript Vol. II, pp. 328–329]. In contrast,

conventional gas often contains aromatics, such as benzene, toluene, methylbenzene and xylenes, that are subject to regulation if released. [Transcript Vol. II, p. 328].

63. Taking all of Rhinesmith's findings together, and using his modeling for the sake of simplicity, we find that water is removed throughout the sequence of equipment, beginning with the annulus of the well. There are 1000 pounds of water vapor per million cubic feet of gas when the gas rises from the coal seam. [Transcript Vol. I, p. 77]. Most of this water must be removed to meet a pipeline requirement 5 pounds of water at the outlet of the glycol dehydrator. [Transcript Vol. II, pp. 295–296].

64. Subtracting 28.67 pounds for the header, 118.1 pounds for the screw compressor and its cooling unit, and about 160 pounds for the booster compressors through the glycol dehydrator outlet, Rhinesmith's calculations showed that two-thirds of the water vapor was removed at points other than the header, the screw compressor, and the booster compressor/dehydrator. Rhinesmith says that rest of the vapor is removed in the pipeline systems connecting the equipment. [Transcript Vol. II, p. 320].

65. Water in the pipelines between the screw compressor and the booster compressor is removed by a device known as a pig. Rhinesmith stated that a pig "is a device that is put into a pipe and is used like a squeegee to push those liquids to downstream systems ..." [Transcript Vol. I, p. 172]. He further stated that a pig is "the device that flows through the pipeline to push any liquids from one point in the pipeline system to another point in the system." [Transcript Vol. II, p. 249]. The pig is inserted in the pipeline by a pig launcher located downstream of the screw compressor. The pig pushes water that has condensed in the pipeline to an initial separator located upstream from the booster compressors. [Transcript Vol. II, pp. 320–322]. We find that Rhinesmith is correct in his explanation of the pig and its use. Rhinesmith did not characterize the pig as a dehydrator, and Craig Grenvik affirmed that the Department did not view the pig as a dehydrator. [Transcript Vol. V, p. 1032].

66. If we contrast the 1000 pounds with the 100 pounds of water associated with conventional gas [Transcript Vol. I, pp. 76–77], and use Rhinesmith's estimate of about 100 pounds of water removed by the glycol dehydrator [Transcript Vol. II, p. 317], it is easy to see that all 100 pounds of water in conventional gas could be removed by a glycol dehydrator. Our observation is consistent with Rhinesmith's explanation of the function of a dehydrator in his account of his prior gas processing experience in the Mobile Bay field. [Transcript Vol. I, pp. 50–51; Vol. II, pp. 288–289].

67. Dehydrators are commonly associated with the processing and transport of conventional natural gas. In the record made in this case, these included field dehydrators [Transcript Vol. II, p. 213], and dehydrators associated with improving the quality of gas for transport in downstream pipelines. [Transcript Vol. II, p. 297]. If more carbon dioxide must be removed to meet the specifications of downstream pipelines, the gas can be treated with amine. In doing so, the gas will become resaturated, and "a triethylene glycol dehydrator is typically used downstream of those amine systems to remove the water essentially a second time." [Transcript Vol. II, p. 297]. We therefore find that it is meaningful to distinguish between an initial dehydrator and other dehydrators in the context of conventional natural gas.

68. We find that Rhinesmith's functional orientation results in an extremely broad view of the purposes that any piece of equipment might serve, and would affect distinctions that are made in the statute. For example, Rhinesmith stated that a screw compressor is also a dehydrator. [Transcript Vol. II, p. 263]. Beyond that, Rhinesmith stated that a pipeline is a dehydrator, because it removes water. [Transcript Vol. II, p. 258].

69. Further, Rhinesmith testified that almost any piece of equipment has one or more functions that can be characterized as processing, based on the functions identified in the statutory definition of processing. [Transcript Vol. II, pp. 223–230, 224–236]. Following this logic, the CDP could be characterized as a processing facility. [Transcript Vol. II, p. 236].

70. Storts took a slightly different position than Rhinesmith. Like Rhinesmith, Storts stated that one statutory definition does not preclude others. [Transcript Vol. III, p. 594]. According to Storts, a header can be both a separator and a dehydrator. [Transcript Vol. III, p. 593]. However, Storts drew the line at a pipeline, on the premise that a pipeline is not a device. [Transcript Vol. III, p. 595].

### The Department's Interpretation

71. The Department interprets the pertinent tax statutes in a distinctly different way. The Department's interpretation rests on administration of statutes since 1990, although principally in the context of conventional natural gas production. [Transcript Vol. IV, pp. 673–678]. The Department's interpretations were supported by the professional training and experience of Craig Grenvik, a supervisor manager with responsibilities for oil and gas taxation who also reviews mineral tax audits. [Transcript Vol. V, p. 1002]. Grenvik has an undergraduate degree in petroleum engineering. [Transcript Vol. V, p. 1028].

72. The Department stated its position as follows:

a. The statutes were drafted and passed when conventional gas production was the only gas production in Wyoming. [Transcript Vol. IV, p. 707].

b. The statutes define equipment separately and do not allow interchangeable application of terms. [Transcript Vol. IV, p. 707].

c. The headers are separators. [Transcript Vol. IV, p. 706; Vol. V, p. 1009]. Separation is a production function. [Transcript Vol. IV, p. 707]. The patent description of a header [Exhibit 116], which refers to the header as a separator, is consistent with common usage in the industry. [Exhibit 116; Vol. V, pp. 1036–1037].

d. The only dehydrator in the sequence of equipment is the glycol (or TEG) dehydrator. [Transcript Vol. IV, p. 682; Vol. V, pp. 1008, 1013]. This is consistent with common usage in the production of conventional natural gas. [Transcript Vol. IV, p. 682].

e. For statutory purposes, dehydration occurs in a dehydrator; the existence of dehydration, as the term is commonly used, does not define a dehydrator. [Transcript Vol. IV, pp. 797–798]. Dehydration is a production function unless it occurs within a processing facility. [Transcript Vol. V, p. 1016].

f. A processing facility is not defined by reference to the definition of "processing". Instead, processing facilities are generally large, noticeable, expensive, and identifiable plants that were epitomized by specific installations long known to the Department and the legislature, including but not limited to Opal, Echo Springs, Painter, Whitney Canyon, Carter Creek, Patrick Draw, and Anschutz. [Transcript Vol. IV, pp. 723, 800–801].

g. The principal purpose for the definition of "processing" is to establish which of the expenses incurred at a processing facility are eligible for deduction as processing expense, in the statutory context of alternative valuation methods that must be used when natural gas is not sold at or prior to the point of valuation. [Transcript Vol. IV, p. 799; *Wyo. Stat. Ann. § 39–14–203(b)(vi)(B)–(D)* ].

h. Western's booster compressors and TEG dehydrator do not make a processing facility. [Transcript Vol. IV, p. 722].

i. The point of valuation is at the outlet of the TEG dehydrator. [Transcript Vol. IV, p. 701].

j. If the Department were to accept Williams' theories, established policies for the valuation of natural gas would be unsettled. [Transcript Vol. IV, pp. 706–707].

### Williams' Transportation Issues

73. Storts testified that the calculations of the auditors were flawed because the auditors failed to accurately account for MIGC fees and the associated rebate. The MIGC tariff is $0.35/MMBTU, and the rebate is $0.21/MMBTU. [Transcript Vol. III, pp. 432, 444]. Storts explained that an MCF is not necessarily equal to an MMBTU, and that

the appropriate conversion factor varies from well to well. [Transcript Vol. III, pp. 432–433, 435]. However, Simmons made an adjustment for the MCF/MMBTU difference. [Transcript Vol. V, pp. 910–911, 969–970]. We find that these adjustments appear on a schedule attached to the Audit Department's final issue letter. [Transcript Vol. V, pp. 969–970; Exhibit 501; Exhibit 143, column K]. We also find that, in the aggregate, the effect of the MMBTU conversion was negligible, since the conversion factors for the individual wells are predominantly .957 and 1.045. [Transcript Vol. V, p. 911; Exhibit 143, column K].

74. To the extent that Williams is concerned about the Department's use of the $0.21/MMBTU rebate as the inspiration for the deduction against the Western fee of $0.294/MCF, we find that the ultimate allowance of $0.084 for transportation on Western's pipeline was an estimate from the outset, and the precise calculation of an MCF/MMBTU conversion was unnecessary for that purpose.

75. Williams also complained that the Department failed to account for fuel use charges by the pipelines. However, we find that the calculations of all parties reflect fuel charges as a deduction from gross volumes, allocated back to specific wells. [Exhibit 137; Exhibit 138; Transcript Vol. III, p. 635]. Williams' complaint is therefore baseless.

76. As a separate issue related to transportation, Storts testified that the auditors had failed to deduct transportation charges downstream from Glenrock. [Transcript Vol. III, p. 427]. This claim depends on two points. The first point is that Barrett sold its gas at points downstream of the Glenrock terminus of the Fort Union and MIGC pipelines. [Transcript Vol I, p. 398]. The second point is that, in the audit of state royalty payments, the auditors accepted worksheets showing that Barrett had incurred transportation charges past Glenrock on the Trailblazer Pipeline Corporation and Wyoming Interstate Corporation pipelines. [Transcript Vol III, pp. 464–470]. Taken together, Williams concludes that the auditors failed to deduct all transportation charges that occurred before the (unspecified) point of sale.

77. We find, however, that the evidence supporting this conclusion is negligible. As we have already noted, Williams made no effort to produce Barrett witnesses. In particular, Williams made no effort to produce Barrett witnesses who could speak to the representations about point of sale that were made to the auditors. *Supra.,* ¶ *24.* Storts testified that he was unaware that Barrett representatives had made a representation to the auditors about the point of sale. [Transcript Vol. III, p. 651]. We find that this was in part a consequence of the fact that Williams did not identify this issue until after the final letters were sent from the Departments of Revenue and Audit.

78. The auditors had different guidance for the state royalty audits. [Transcript Vol. V, p. 920]. Unlike the tax audit, the Office of State Lands and Investments directed the auditors to allow transportation after Glenrock, but *not* transportation to Glenrock. [Transcript Vol. V, p. 920]. Williams did not call any witness from the Office of State Lands and Investments to explore the rationale for this difference in guidance, although there is no dispute that calculations of taxes and royalties are governed by different statutes. [Transcript Vol. III, pp. 563–564]. Moreover, since the auditors had accepted Barrett's representation of a Glenrock point of sale, and this issue was not raised by Williams until the appeal following the final audit letter, we find that the auditors never had reason to initiate an investigation of the reasons for the different guidance.

79. Indeed, Storts was the only witness called by Williams to testify on the downstream transportation issue, and his knowledge was strictly limited to inferences he had drawn from royalty audit spreadsheets. He was unfamiliar with the terms and provisions of the Wyoming state leases for the audited wells. [Transcript Vol. III, p. 564]. He was unable to establish reliable foundation for actual delivery points, actual sales, and the revenues and costs associated with actual sales. [Transcript Vol. III, pp. 580–582]. That was the job of Barrett's marketing department. [Transcript Vol. III, p. 582].

Similarly, he was unable to assure that transportation charges were properly associated with Powder River Basin sales, since that was the job of Barrett's gas management people. [Transcript Vol. III, p. 584]. Such basic items as rebates paid by Western against the MIGC charges are not evident from the face of the schedules offered into evidence. [Exhibit 139; Transcript Vol. V, p. 585]. Storts further admits that he has never negotiated any contracts, and never discussed his factual conclusions with a Williams contract administrator or a Barrett contract administrator. [Transcript Vol. III, p. 603]. Taking all of his testimony into account, we find that Storts' inferences are entitled to little weight.

80. As a separate issue related to transportation, Williams examined Simmons for the purpose of demonstrating that the auditors failed to account for a fixed shipping rate under the two agreements with Fort Union. [Transcript Vol. V, pp. 936–937]. However, based upon a comparison of actual Fort Union charges and the rates required under the terms of Fort Union's Firm Gathering Agreement if it were in effect, we find that the fixed rates were not in effect in 1999. [Transcript Vol. V, pp. 953–955; Exhibit 140, p. 2; Exhibit 145, Section 4.2].

### The Exempt Royalty Issue

81. Storts testified that the calculations of the auditors were in error because the auditors failed to allow a deduction for state royalties, which are exempt from severance taxes. [Transcript Vol. III, pp. 426, 447–449]. Barrett's payments of state royalties were audited for the period February 1999 through December 1999. On March 15, 2002, the Department of Audit ordered Williams to report and pay additional state royalties. [Exhibit 152]. However, Wyoming State Lands and Investments had agreed to stay action pending current litigation regarding state royalties. [Transcript Vol. III, p. 565].

82. Williams accrued the exempt royalties on its general ledger in a long-term liability account. [Transcript Vol. III, pp. 565, 568].

83. Williams disagrees that the royalties should be paid, and has taken no action to comply with the March 15, 2002, order other than the accrual in its books. [Transcript Vol. III, pp. 572–573]. The Department refuses to allow a deduction for royalties that are in dispute. [Transcript Vol. IV, pp. 804–805]. Simmons likewise says that the auditors would allow an amount that has been accrued only after the dispute is resolved. [Transcript Vol. IV, pp. 962–963].

### Other

84. Any Conclusion of Law set forth below which includes a Finding of Fact may also be considered a finding of fact and is therefore incorporated herein by reference.

## CONCLUSIONS OF LAW

85. Williams identified four principal errors in its Amended Case Notice/Amended Notice of Appeal. The four claimed errors were:

1. The Department determined that Barrett's production process was completed, and therefore the point of valuation was located, at the outlet of [Western's] dehydration unit.

2. The Department miscalculated the allowable transportation deduction.

3. The Department failed to exclude the total amount of exempt royalties from the taxable value of Barrett's 1999 production.

4. The Department assessed interest on the alleged underpayment of taxes.

86. Williams elaborated considerably on the details of these four errors in subsequent pleadings. Those pleadings have been reflected in our decision.

### The Role of the Board

87. The role of this Board is strictly adjudicatory:

It is only by either approving the determination of the Department, or by disapproving the determination and remanding the matter to the Department, that the issues brought before the Board can be resolved successfully without invading the statutory prerogatives of the Department.

*Amoco Production Company v. Wyoming State Board of Equalization*, 12 P.2d [P.3d]

668, 674 (Wyo.2000). The Board's duty is to adjudicate the dispute between the taxpayers and the Department.

### Burden of proof

88. "The burden of proof is on the party asserting an improper valuation." *Amoco Production Company v. Wyoming State Board of Equalization*, 899 P.2d 855, 858 (Wyo.1995); *Teton Valley Ranch v. State Board of Equalization*, 735 P.2d 107, 113 (Wyo.1987). The Board's Rules provide that, "the Petitioner shall have the burden of going forward and the ultimate burden of persuasion, which burden shall be met by a preponderance of the evidence. If Petitioner provides sufficient evidence to suggest the Department determination is incorrect, the burden shifts to the Department to defend its action. . . ." *Rules, Wyoming State Board of Equalization, Chap. 2, § 20.*

### The point of valuation

#### Objective of the Statutes

89. The Wyoming Constitution requires the gross product of mines to be taxed in proportion to the value thereof and uniformly valued for tax purposes at full value as defined by the legislature. *Wyo. Const. Art. 15, §§ 3, 11.* For natural gas, the value of the gross product "means fair market value as prescribed by Wyo. Stat. Ann. 39–14–203(b), less any deductions and exemption allowed by Wyoming law or rules." *Wyo. Stat. Ann. § 39–14–201(a)(xxix).*

90. "The fair market value for . . . natural gas shall be determined after the production process is completed. . . . [E]xpenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral." *Wyo. Stat. Ann. § 39–14–203(b)(ii).* These two sentences contain two fundamental premises for our decision.

91. First, the point of valuation is a physical location. This physical location is determined by reference to the production process, and where that production process is completed. We will accordingly be deciding which party appropriately identified a point in the sequence of equipment that was the point of valuation.

92. Second, the point of valuation directly affects the calculation of expenses that may be deducted from Barrett's sale price to determine fair market value. Barrett sold its gas at a location beyond the point of valuation. *Findings of Fact, ¶ 19.* For natural gas sold after the point of valuation, expenses incurred after the point of valuation are deducted from the sale price to reach fair market value. *Wyo. Stat. Ann. § 39–14–203(b)(vi).* The taxpayer argues for a point of valuation that is closer to the wellhead, and further from the point of sale, than the point of valuation chosen by the Department of Revenue. If we found for the taxpayer, the effect would be to increase the deduction of expenses from the sale price of the taxpayer's natural gas.

### The Point of Valuation Statute

93. The statute determines the point of valuation for natural gas by reference to the production process:

> The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first.

*Wyo. Stat. Ann. § 39–14–203(b)(iv)* (hereafter, the point of valuation statute).

94. Williams takes two conflicting positions that reach the same result. On the one hand, Williams argues that both the header and the screw compressor were dehydrators, so that the custody transfer meter located between them was an acceptable point of valuation. *See Findings of Fact, ¶¶ 48, 49, 68–70.* On the other hand, Williams argues that if the glycol dehydrator was the only piece of equipment in which dehydration was performed, then the glycol dehydrator was located in a processing facility operated by Western, and the custody transfer meter is the point of valuation. *See Findings of Fact,*

¶¶ *37–39.* If either theory were correct, Barrett's original deduction for expenses would likewise be correct, since Barrett reported its taxes using the custody transfer meter as the point of valuation. *See Findings of Fact,* ¶ *27.*

95. The Department takes the position that the glycol dehydrator is the only dehydrator, and that there is no processing facility. *Findings of Fact,* ¶ *72.* Under this theory, the point of valuation is the outlet of the glycol dehydrator. *Findings of Fact,* ¶ *72.*

96. We must construe the point of valuation statute in light of all of statutory language relating to the same subject matter, as found in the Oil and Gas Article of Chapter 14 of the Wyoming Statutes. *Petra Energy, Inc. v. Department of Revenue, State of Wyoming,* 6 P.3d 1267, 1270 (Wyo.2000). This is a complex set of sections in which some words have been defined. The defined words include "dehydrator," *Wyo. Stat. Ann. § 39–14–201(a)(vii);* "natural gas", *Wyo. Stat. Ann. § 39–14–201(a)(xv);* "processing", *Wyo. Stat. Ann. § 39–14–201(a)(xviii);* "separating", *Wyo. Stat. Ann. § 39–14–201(a)(xxii);* "compressor", *Wyo. Stat. Ann. § 39–14–201(a)(v);* and "gathering", *Wyo. Stat. Ann. § 39–14–201(a)(ix).* Other significant words and phrases are not defined, including "process", "production process", "processing facility", "dehydration", "compression", and "separation." In view of the care with which the legislature has both defined and employed these words, we conclude that settled interpretations of earlier versions of the point of valuation statute provide little guidance. E.g., *Chevron U.S. A., Inc. v. State,* 918 P.2d 980 (Wyo.1996).

### A. The initial dehydrator

97. The point of valuation statute provides two possible avenues to determine when and where the production process is completed. *Wyo. Stat. Ann. § 39–14–203(b)(iv).* The first avenue turns on the existence of an "initial dehydrator."

98. We determine the meaning of the word "initial" by reference to its plain and ordinary meaning. *Campbell County School District v. Catchpole,* 6 P.3d 1275, 1285 (Wyo. 2000). It is an adjective which means "having to do with, indicating or occurring at the beginning." *Webster's New World College Dictionary (4th Edition 2001)* p. 735. We will therefore be concerned with the first dehydrator to occur in the sequence of equipment.

99. On behalf of Williams, Rhinesmith directed our attention to three possible dehydrators: the header; the screw compressor; and the glycol dehydrator. *Findings of Fact,* ¶¶ *56–59.* We will consider whether the statute enables us to determine whether one or more of these pieces of equipment is a dehydrator. We note that Williams' Hearing Brief asserts that *"dehydration* occurs" at the header and "was performed" at the screw compressor. Petitioner's Hearing Brief, pp. 8–9. We conclude the plain language of the first sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv) directs our attention to a "dehydrator," not to dehydration.

100. The statute defines "dehydrator" as "a device which removes water vapor that is commonly associated with raw natural gas." *Wyo. Stat. Ann. § 39–14–201(a)(vii).*

### The glycol dehydrator

101. The common meaning of "device" is "an invention or contrivance, esp. a mechanical one, for some specific purpose." *Webster's New World College Dictionary* (4th Edition 2001) p. 395. Considering this common meaning in the context of the statutory definition, the glycol dehydrator is clearly an invention or contrivance for the specific purpose of removing water vapor from natural gas. *Findings of Fact,* ¶ *61.* As its name implies, the glycol dehydrator fits within the core of the statutory definition of a dehydrator as a "device which removes water vapor."

### The screw compressor

102. By statutory definition, the screw compressor a different type of device. A "compressor" is "a device associated with processing or transporting natural gas which mechanically increases the pressure of the natural gas." *Wyo. Stat. Ann. § 39–14–201(a)(v).* We conclude that the screw compressor is such a device. We must "con-

strue the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute *in pari materia* so that no part will be inoperative or superfluous." *Fall v. State*, 963 P.2d 981, 983 (Wyo.1998). It follows that the screw compressor cannot be both a compressor and a dehydrator, because that would make the legislative distinction superfluous. The screw compressor is a compressor.

103. Our disposition of the screw compressor is further supported by the fact that water which condenses in the vicinity of the screw compressor is removed elsewhere. *Findings of Fact*, ¶ 58.

104. Our disposition of the screw compressor also disposes of the argument that the booster compressors act as dehydrators. They, too, are compressors.

### The header

105. The header presents a more complex question. The witnesses appear to be in general agreement that the header is a separator. *E.g.*, *Findings of Fact*, ¶¶ 70–72c. This consensus is supported by such documentary evidence as the language of the patent on Barrett's stacked vertical header, *Findings of Fact*, ¶ 55, and Williams' admissions in its response to the preliminary audit findings. *Findings of Fact*, ¶¶ 37b, 38d. It is further supported by the Audit Department memorials of conversations with Barrett personnel in the fact-finding stage of the audit. Those Barrett personnel identified only the glycol dehydrator, not the header, as a dehydrator. *Findings of Fact*, ¶¶ 12–13, 22–23.

106. One objection to characterizing the header as a separator is that the statute defines "dehydrator" as a kind of device, and defines "compressor" as a kind of device, but does not define "separator" as a device. Instead, the statute defines "separating." "Separating" is "the isolation of the well stream into discrete gas, liquid hydrocarbons, liquid water and solid component." *Wyo. Stat. Ann.* § 39-14-201(a)(xxii). Based on the evidence, we conclude that the header performs the function of separating,

as that function is defined by statute. Nonetheless, the legislature could have defined another device, a separator, but instead chose to define a function.

107. The statutory distinction between "dehydrator" and "separating" is therefore not as clear as the statutory distinction between "dehydrator" and "compressor." However, the Department has interpreted the statute to preclude the characterization of a device as both a separator and a dehydrator. *Findings of Fact*, ¶ 72b. We conclude that the Department's interpretation of the statute does not conflict with legislative intent. We therefore defer to the Department's conclusion that the header is a separator, and is not a dehydrator. *Board of County Commissioners, Sublette County, v. State Board of Equalization*, 33 P.3d 107, 113, 2001 WY 91, ¶ 16 (Wyo.2001).

### The pig

108. Williams' expert characterized the pig as a device that flows through the pipeline to push liquids from one point in the pipeline system to another point in the system. *Findings of Fact*, ¶ 65. It is therefore a different type of device than a dehydrator, even though it is not a device that is addressed in the statute. We conclude that the pig and its related components are not a dehydrator.

### Other possible devices

109. We conclude that pipelines are not devices, and cannot be dehydrators.

110. The evidence established that any intentional enlargement of the pipeline, at a point as far upstream as next to the wellhead, could create a pressure drop causing water condensation. Such an enlargement might be characterized as a special-purpose device intended to remove water at that point. By our heavy reliance on the common meaning of "device," we do not wish to suggest that the intention of a device wholly governs the result we reach today. We do not conclude Williams has merely failed to identify as a dehydrator some section of the equipment train that was not specifically considered during the course of the hearing. This is therefore an occasion when we believe

it is appropriate to depart from the general rule and resort to extrinsic aids to interpretation to confirm the plain meaning. *Parker Land & Cattle Co. v. Wyoming Game & Fish*, 845 P.2d 1040, 1043 (Wyo.1993).

111. The Department has suggested that a focus on the word "remove" can resolve any questions related to the identification of devices that are dehydrators. The common meaning of remove in this context is "to take, extract, separate, or withdraw (someone or something *from)*." *Webster's New World College Dictionary* (4th Edition 2001) p. 1213. The Department takes the position there is significant nuance in "remove." The Department believes that this nuance supports a distinction between active and passive devices. [Transcript Vol. IV, pp. 708–709; Vol. V, pp. 1033–1034]. On this basis the Department would not characterize a passive condensation device as a dehydrator. [Transcript Vol. IV, pp. 708–709; Vol. V, pp. 1033–1034]. The Department's interpretation does not conflict with legislative intent, and we will defer to its conclusion. *Board of County Commissioners, Sublette County, v. State Board of Equalization, Id.,* ¶ 16 (Wyo.2001). However, since the common meaning of "remove" includes the verb "separate," which is confusing in this context because the statute defines "separating," we are not completely satisfied with this analysis.

112. Taking into account the positions of the parties, we conclude that the definition of "dehydrator" is ambiguous with respect to what water vapor is the "water vapor that is commonly associated with raw natural gas." A statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. *Parker Land & Cattle Co. v. Game & Fish*, 845 P.2d 1040, 1043 (Wyo. 1993). Williams assumes that all water vapor associated with raw natural gas, including the water vapor associated with coalbed methane, satisfies this definition. Williams makes this assumption, however, in the face of the testimony of their expert that there are substantial differences between coalbed methane production and the production of conventional natural gas. *Findings of Fact,* ¶¶ *1–3.*

113. Coalbed methane is distinguished from conventional natural gas by saturation with water; we have accepted Rhinesmith's testimony that coalbed methane initially carries approximately ten times as much water as conventional natural gas. *Findings of Fact,* ¶ *3.* Indeed, Rhinesmith has testified that in handling coalbed methane, "water was a key factor in trying to decide the configuration of the systems, how the gas would be produced, and how to make that gas transportable into downstream markets." [Transcript Vol. II, p. 284]. We question whether the legislature intended to apply the definition of dehydrator to apply in a production environment where condensation is unavoidable throughout the sequence of equipment and piping.

114. The low pressure under which coalbed methane is produced, *Findings of Fact,* ¶ *2,* also causes us to conclude that coalbed methane must be distinguished from conventional natural gas. The low pressure environment contributes to the ease of creating condensation by simple modifications to the equipment train. *Findings of Fact,* ¶ *57.*

115. In ascertaining legislative intent in enacting a statute, we may look at the historic setting surrounding the enactment of the statute. *Parker Land & Cattle Co. v. Game and Fish, id.,* at 1044.

116. The legislature enacted the point of valuation statute and the definitions of dehydrator, compressor, separating, and processing in 1990. *1990 Wyo. Sess. Laws, Ch. 54.* Coalbed methane was not commercially significant at the time. *Findings of Fact,* ¶ *4.* We accordingly conclude that the reference to water vapor commonly associated with raw natural gas is a reference to the water vapor in conventional natural gas. Based on the facts presented in this case, the glycol dehydrator, all by itself, possessed adequate capacity to remove water vapor in quantities associated with conventional natural gas. *Findings of Fact,* ¶¶ *60, 66.* We conclude that the legislature's intention was to only identify as a dehydrator a device that is the same or similar to the one identified in this case as the glycol dehydrator. The Department offered a similar rationale for its interpretation of the statute, but declined to concede that the statute is in any way ambig-

uous. [Transcript Vol. IV, pp. 680–682, 708–709, 750].

117. We are also obliged to avoid a construction that reaches an absurd result. *Stauffer Chemical Company v. Curry*, 778 P.2d 1083, 1093 (Wyo.1989). It would be absurd to accept as a dehydrator any enlarged space that creates condensation. This would allow the taxpayer to freely manipulate the point of valuation with inexpensive measures. It is also contrary to an expectation expressed in the first sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv) that the initial dehydrator follows other production functions. As the record in this case also shows, a principal purpose of a glycol dehydrator was to make raw natural gas ready for transportation by pipeline. Further, we believe it is logical to infer that the legislature contemplated that normally such dehydration would be a last step in the production of gas that was not processed.

118. Our resolution of the ambiguity is consistent with the conclusions we have already reached. The glycol dehydrator fits within the statutory definition, but the headers, compressors, pipelines, and pig do not. Our resolution is consistent with, and supports, the Department's interpretation. Our resolution provides a basis for distinguishing between dehydration and *incidental condensation* during the production process.

### B. The definition of a processing facility

119. Williams' alternative theory is that Western's booster compressors and glycol dehydrator are a processing facility. Under this theory, the point of valuation is determined by reference to the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv): "When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first." Williams' alternative argument rests an assumption that the Board might conclude that the glycol dehydrator was the only dehydrator, and we have done so. *Supra.,* ¶¶ *97 et. seq.* If the glycol dehydrator were part of a processing facility,

Williams would be correct in concluding that the custody transfer meter is the point of valuation. However, we conclude that Western's equipment is not a processing facility.

120. As a preliminary matter, we note that the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv) refers to "dehydration" rather than to a dehydrator. We conclude that such dehydration must be performed in a statutorily-defined dehydrator. The second sentence begins, "When no dehydration is performed. . . ." The word "performed," in such close proximity to the word "dehydrator" at the end of the first sentence, suggests that the statutorily-defined dehydrator is what performs dehydration. However, if dehydration could be performed by a piece of equipment that is not a dehydrator, the statute might prescribe no point of valuation under some circumstances: there might not be a dehydrator to satisfy the requirements of the first sentence, but there might also be dehydration outside of a processing facility, which would negate the contingency of the second sentence. Our interpretation should avoid this absurd result. *Stauffer Chemical Company v. Curry, id.,* at 1093. The statute means that dehydration, as used in the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv), is performed in a dehydrator, as defined in Wyo. Stat. Ann. § 39–14–201(a)(viii).

### The definition of processing

121. The statute does not define "processing facility." The statute does define "processing:"

"Processing" means any activity occurring beyond the inlet to a natural gas processing facility that changes the well stream's physical or chemical characteristics, enhances the marketability of the stream, or enhances the value of the separate components of the stream. Processing includes, but is not limited to fractionation, absorption, adsorption, flashing, refrigeration, cryogenics, sweetening, dehydration within a processing facility, beneficiation, stabilizing, compression (other than production compression such as reinjection, wellhead pressure regulation or the changing of pressures and temperatures in a reservoir)

and separation which occurs within a processing facility.

*Wyo. Stat. Ann. § 39–14–201(a)(xviii).* This is a more complex definition than one would expect for the root word of "processing", which is "process". The common meaning of process is "a particular method of doing something, generally involving a number of steps or operations." *Webster's New World College Dictionary* (4th Edition 2001) p. 1144.

122. The Williams position rests on the premise that the existence of a processing facility may be determined by reference to the functions described and listed in the definition of processing. Storts testified that he was the original source of this position. *Findings of Fact,* ¶ *30.* The position was later elaborated in detail by Williams' counsel in response to the preliminary audit findings. *Findings of Fact,* ¶¶ *38–39.* The difficulty with the Williams position is that Williams depends upon a circular reading of the statute. We conclude that a circular reading is not supported by the plain language of the statute. Our conclusion is supported when we read the definition of "processing" in pari materia with other provisions of the statute, as we must. *Fall v. State, id.,* at 983; *Parker Land & Cattle Co. v. Game and Fish, id.,* at 1042.

### The characteristics of a processing facility

123. Processing is "any activity occurring beyond the inlet to a natural gas processing facility ..." "Natural gas", is defined by statute. *Wyo Stat. Ann § 39–14–201(a)(x).* In its briefs and argument, Williams has ignored this definition, which provides direct insight into the legislature's intent, even though this definition was not enacted until 1998. *1998 Wyo. Sess. Laws, Ch. 5.* The second sentence of the definition of natural gas states, "For the purposes of taxation, the term natural gas *includes products separated for sale or distribution during processing the natural gas stream including, but not limited to plant condensate, natural gas liquids and sulfur." Wyo. Stat. Ann. § 39–14–201(a)(xv)* (emphasis supplied). This defini-

tion expresses at least some of the anticipated results of processing.

124. The only substantial difference in composition between coalbed methane at the wellhead, and the same gas at the inlet to the glycol dehydrator, is the degree to which that gas is saturated with water. In the glycol dehydrator, amounts of various impurities are removed in such trivial quantities that they may be vented into the air without being subject to Wyoming's air quality regulations. *Findings of Fact,* ¶ *62.* We have accepted Rhinesmith's testimony that coalbed methane is not complex natural gas, because it contains few heavy hydrocarbons and few impurities. In the absence of heavy hydrocarbons and substantial impurities, we would not anticipate that Barrett's coalbed methane would yield "plant condensate, natural gas liquids [or] sulfur," as stated in the statutory definition of "natural gas." The evidence was consistent with our expectation.

125. The witnesses from the Departments of Revenue and Audit uniformly testified to an understanding of the characteristics of processing facilities in Wyoming. *Findings of Fact,* ¶¶ *40, 72f.* That common understanding fits squarely with the results of processing anticipated by the second sentence of the natural gas definition. For example, Simmons testified that if there were a processing facility, she would have expected settlement statements to indicate the segregation and sale of liquid products or byproducts such as sulfur. *Findings of Fact,* ¶ *40.* Bolles explained that there was an identifiable universe of processing plants, such as Whitney Canyon, Painter, and Carter Creek. *Findings of Fact,* ¶ *72f.*

### The statutory context of the processing definition

126. In formulating its position, Williams has also ignored the principal statutory context in which the word "processing" appears, although the Department has not. *Findings of Fact,* ¶ *72g.* The statute provides four methods for determining the fair market value of natural gas sold after the point of valuation. *Wyo. Stat. Ann. § 39–14–203(b)(vi).* Three of these methods depend on calculations which account for processing

fees or costs. *Wyo. Stat. Ann. §§ 39–14–203(b)(vi)(B)(comparable value); 39–14–203(b)(vi)(C)(netback); 39–14–203(b)(vi)(D)(proportionate profits).*

127. Valuation determinations with direct and significant tax consequences warrant the precision that the detailed definition of "processing" provides. The plain language of the definition demonstrates the care taken by the legislature to distinguish between production activity (not deductible) and processing activity (deductible). For example, separation for production purposes is not deductible under the first sentence of the point of valuation statute. *Wyo. Stat. Ann. § 93–14–203(b)(iv).* However, separation which occurs within a processing facility is deductible due to the definition of "processing" and the use of that word in the valuation methodology provisions of the statute. *Wyo. Stat. Ann. § 39–14–203(b)(vi).* Moreover, the functional breadth of the "processing" definition provides useful guidance regarding the limits deductible fees and costs.

128. We must interpret the statute in light of its grammatical structure. *Resolution Trust Corp. v. Love,* 36 F.3d 972, 976 (10th Cir.1994). A careful observer may object that the statute defines processing as a noun (an activity), yet employs processing as an adjective in the valuation methodology provisions. We conclude instead that processing, as used in the valuation methodology provisions, is an attributive modifier, and is therefore a noun. *The Cambridge Grammar of the English Language,* Chapter 6, § 2.4.1 (2002), p. 537. Grammatical structure does not interfere with our interpretation.

*Deference to the Department's interpretation*

129. When we take the evidence in the case into account, in light of all of the pertinent provisions of statute, we conclude that Western's booster compressors and glycol dehydrator are not a processing facility.

130. We also conclude that the Department's interpretation does not conflict with legislative intent, and defer to the Department's conclusion that Western's booster compressor and glycol dehydrator are not a processing facility. *Board of County Commissioners, Sublette County, v. State Board of Equalization, id.,* ¶ 16 (Wyo.2001).

131. Our ruling is complicated by a concession from Bolles that there may be a "little ambiguity" in the definition of "processing facility." We conclude that any such ambiguity can be resolved in the same manner that we have resolved the ambiguity with respect to the definition of "dehydrator." *Supra.,* ¶ *116.* The definition of "processing" and the valuation methods that employ the definition were enacted in 1990. *1990 Wyo. Sess. Laws, Ch. 54.* The universe of natural gas processing facilities for conventional natural gas production was certainly known to the legislature in 1990, and provides a paradigm for construction of the statute. In contrast, we conclude that the facilities related to coalbed methane were not similarly known and could not have been a premise for the statutes enacted by the legislature.

*The initial transportation related compressor*

132. In light of our disposition of the processing facility issue, we need not address Williams' characterization of the screw compressor as the initial transportation related compressor. This issue only arises if the point of valuation is determined under the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv). We have concluded that the point of valuation is determined under the first sentence.

*C. The Board's decision in Docket No. 2001–117*

133. Williams argues that the Board's Findings of Fact and Conclusions of Law in this case are controlled by Findings made in *In the Matter of the Appeal of Lance Oil & Gas Company,* SBOE Docket No. 2001–117, 2002 WL 31256340 (Wyo.St.Bd.Eq.) (*Lance Oil & Gas* ). In *Lance Oil & Gas,* the Board determined that a sales tax was due on services performed for the installation of underground gathering lines between coalbed methane wells and the pod, because the services were part of "equipping for production"

within the meaning of Wyo. Stat. Ann. § 39–15–103(a)(i)(K).

134. Williams directs our attention to ¶ 22 of the Findings of Fact. Paragraph 22 appears in a section of the Board's opinion entitled, Gathering Lines are Part of Equipping for Production:

> 22. The Wyoming Statutes specify that when valuing natural gas for severance and ad valorem purposes, production is complete when gas travels through the gathering lines and enters the custody transfer meter. *Wyo. Stat. Ann. § 39–14–203(b)(iv)*.

*Lance Oil & Gas,* ¶ 22.

135. The Finding of Fact was accompanied by a related Conclusion of Law, which appears in a section of the Board's opinion entitled, The Services Performed on the Gathering Lines Were Taxable Because They Were Services That Were "Equipping for Production":

> 49. The placement of the [custody transfer] meter as the physical point when "equipping for production" ceases to be taxable is reasonable given the surrounding facts is consistent with Wyoming Statute § 39–2–208(b)(ii) (recodified as Wyo. Stat. § 39–14–203(b)(iv)).

*Lance Oil and Gas,* ¶ 49.

136. The point of valuation statute contemplates four different valuation points, depending on the facts in hand: the outlet of the initial dehydrator; or, the inlet to the initial transportation related compressor, custody transfer meter or processing facility. *Wyo. Stat. Ann. § 39–14–203(b)(iv)*. Williams argues that the precedent of *Lance Oil & Gas* binds the Department to select the custody transfer meter as the valuation point for coalbed methane production. [Petitioners' Hearing Brief, pp. 9–12]. We note that this argument asks us to exalt *Lance Oil & Gas* above the plain language of the statute, which directs attention to the circumstances of each taxpayer.

137. Williams neglects to account for a significant distinction of fact between *Lance Oil & Gas* and the case at hand. In *Lance Oil & Gas,* there is no mention of a dehydrator, much less a processing facility. In the absence of a dehydrator, and assuming that the equipment train is otherwise the same as the equipment train at issue in this case, the point of valuation must be the custody transfer meter. This is a direct consequence of the second sentence of Wyo. Stat. Ann. § 39–14–203(b)(iv). Both the Department and this Board were obliged to so find under the circumstances then presented. In light of this difference, we conclude that *Lance Oil & Gas* cannot and does not control this case.

138. There are other practical distinctions between this case and *Lance Oil & Gas.* The Findings of Fact in *Lance Oil & Gas* focus on gathering lines between the wellhead and the pod. The existence of a point of valuation beyond the custody transfer meter was of no practical interest for sales tax purposes. Even if the taxpayer instead had procured the installation of lines to a point beyond the custody transfer meter, the taxpayer would have had no reason to dispute the results of its audit by taking a position that extended the point of valuation further from the wellhead. Doing so would only have increased the taxpayer's exposure to sales taxes.

139. Although the facts of *Lance Oil & Gas* turned on the treatment of services related to gathering lines, sales tax issues so predominated that the Board had not reason to cite the statutory definition of "gathering" for any purpose. *See Wyo. Stat. Ann. § 39–14–201(a)(ix)*. This proceeding was different. Williams presented evidence to demonstrate that any gathering in the statutory sense ended at the CDP, or pod. Transcript Vol. III, p. 422. We note that the statutory definition of gathering does not coincide with the terminology of Barrett's Gas Gathering Agreement with Western. *Compare Findings of Fact,* ¶ 8.

140. Williams next argues that we must bind the Department to a point of valuation at the custody transfer meter by application of the doctrine of collateral estoppel. We begin with a statement of the principles involved:

> The doctrines of res judicata and collateral estoppel incorporate 'a universal precept of common-law jurisprudence' * * * that a right, question or fact put in issue, and

directly determined by a court of competent jurisdiction, cannot be disputed in a subsequent suit by the same parties or their privies.... While the interests of finality served by this doctrine are the same, this court has carefully distinguished between the two: [A]lthough many cases speak of res judicata in the administrative context, they actually apply collateral estoppel. * * * Collateral estoppel .... bars relitigation of previously litigated *issues*. * * * Res judicata on the other hand bars relitigation of previously litigated *claims* or causes of action.

*Tenorio v. State ex rel. Wyoming Workers' Compensation Division*, 931 P.2d 234, 238 (Wyo.1997)(emphasis in original).

141. The Wyoming Supreme Court has identified four factors that we must consider:

Generally, four factors are considered when determining application of collateral estoppel: (1) whether the issue decided in the prior adjudication was identical to the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was in a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*Tenorio*, 931 P.2d at 238–239.

142. Williams claims that the issue decided in *Lance Oil & Gas* was "where the production process for CBM gas is completed." Petitioner's Hearing Brief, p. 16. Its arguments for application of the four elements of collateral estoppel stem from that principal point. We conclude that the doctrine of collateral estoppel does not apply, for at least three reasons.

143. First, the issue decided in *Lance Oil & Gas* was whether "a sales tax was due on services performed for the installation of underground gathering lines between coalbed methane wells and the pod." This case does not involve a sales tax. We conclude not only that the issue differed, but also that there was not a judgment on the pertinent merits in the prior proceeding.

144. Second, the Board had no occasion in *Lance Oil & Gas* to examine the application of the definitions on which the point of valuation depends. There is no reference in *Lance Oil & Gas* to either a dehydrator or a processing facility. We conclude not only that the issue differed, but also that there was not a full and fair opportunity to litigate the issues of this case in the prior proceeding.

145. Third, because the parties in *Lance Oil & Gas* were interested in sales tax related to gathering lines between the wellhead and the CPD, the ancillary references to Wyo. Stat. Ann. § 39–14–203(b)(iv) had no direct impact on the decision. That is, there was no practical impetus for a careful examination of the factual premises on which the point of valuation depends. We conclude not only that the issue differed, but also that there was not a full and fair opportunity to litigate the issues in this case in the prior proceeding.

146. We believe our conclusion is even clearer when broadly considered in light of the common law policy concern for relitigation. Williams did not come to us as a petitioner that has taken a consistent position over time on either the facts or the application of those facts under the statute. This is a very different dispute than that presented to us in Docket No. 2001–117, and one made considerably more complex by the Petitioner's own shifting positions. We conclude that the concern for relitigation is groundless.

147. Despite our ruling, there may be some value in clarifying the intent of our ruling in *Lance Oil & Gas*. The Finding in ¶ 22 might be more correctly stated as, "The Wyoming Statutes specify a number of alternatives for valuing natural gas for severance and gross products tax purposes, depending on specific circumstances. *Wyo. Stat. Ann. § 39–14–203(b)(iv)*. One of those alternatives is the custody transfer meter." The Conclusion of Law in ¶ 49 might be more correctly stated as, "The custody transfer meter is a convenient line of demarcation between the ownership of the gas producer and the gas gatherer. Even when

it is not the point of valuation for severance and gross products tax purposes, it remains convenient and useful for excise tax purposes." To the extent that this clarification may be characterized as a departure from our opinion in *Lance Oil & Gas*, it is one that is necessary "to vindicate plain obvious principles of law. . . ." *Goodrich v. Stobbe*, 908 P.2d 416 (Wyo.1995), quoting *Gueke v. Board of County Commissioners*, 728 P.2d 167, 171 (Wyo.1986).

### Transportation deduction calculations

148. Williams mounts three attacks on the Department's determination of a transportation deduction. (1) Williams contends that the Department's calculation for an allowance of a portion of the fees paid to Western was arbitrary. (2) Williams contends that the Department failed to accurately calculate the fees charged for transportation on the Fort Union and MIGC pipelines. (3) Williams contends that the Department failed to allow for pipeline transportation expense downstream from (beyond) Glenrock.

149. Our disposition of these three issues relies on the burdens of proof. Williams bears the burden of going forward and the ultimate burden of persuasion, and must meet those burdens by a preponderance of the evidence. The burden shifts to the Department "If Petitioner provides sufficient evidence to suggest the Department determination is incorrect . . ." *Supra.*, ¶ *88*. For each of the three issues, Williams relied exclusively on the testimony of Greg Storts to meet its burden of going forward.

### A. Allocation of the Western fee

150. Of the total fees paid to Western of $.434/MCF, the auditors allowed a total deduction of $.224/MCF. This allowance was comprised of $.14/MCF for pipeline fees between Western's facilities and Glenrock, plus $.084/MCF of the $.294/MCF of fees attributed to Western's services. The $.084/MCF was an estimate of costs from the outlet of the glycol dehydrator to the inlet of the MIGC or Fort Union pipeline. Storts correctly surmised that auditors disallowed $.21/MCF based on a relation to Western's rebate

of $.21/MMBTU against the MIGC tariff, in effect giving Barrett something like a double allowance.

151. At the same time, Williams provided no evidence of what a reasonable allocation of the Western fees should be. To the contrary, Williams consciously avoided an enquiry to Western that might have yielded a more accurate basis for an allocation. *Findings of Fact*, ¶ *43*.

152. The Board has accepted the Department's selection of a point of valuation, and therefore must decide the dispute between the parties concerning the deductions which result from the point of valuation. Williams did nothing to support an allocation of the fee for Western's services. On review of the evidence presented at the hearing, we conclude that there is no further information available to the Department that would enable the Department to prepare a better estimate of the allocation of Western costs even if we were to contemplate remanding the case to the Department for more thorough review. The auditors rejected the alternative of denying any allowance, and we cannot conclude that the denial of any allowance would have been more reasonable.

153. With its allocation, the Department has determined that approximately 70% of the fees charged by Western are associated with services between the custody transfer meter and the outlet of the glycol dehydrator. Storts did nothing to demonstrate that this allocation was unreasonable or incorrect, other than question the logic of the Department's estimate. Under the circumstances of this case, we conclude that Williams failed to carry the burden of showing that the Department determination is incorrect. The burden of proof remained with Williams.

154. In our Findings of Fact, we determined that the auditors reached an allowance of $.084/MCF of the Western fees based on two premises. We conclude that this matter should be decided as the Department has done. First, some amount of allowance was fair. Second, the costs, including fuel costs, associated with Western services from the custody transfer meter to the outlet of the glycol dehydrator were greater than the corresponding costs from the outlet of the glycol

dehydrator to the inlets of the Fort Union and MIGC pipelines. *Findings of Fact, ¶ 43.* We note that the auditors had toured representative field facilities. *Findings of Fact, ¶¶ 21–23.* We conclude that the judgment of the auditors was supported by first-hand field knowledge in the form of the site visit granted by Barrett under the guidance of Nathan Lopez, Barrett's operations supervisor. We conclude that the auditors made a reasonable estimate based on the best information available.

155. We have concluded that the Department had some reasoned basis for the transportation allowance of $.084/MCF, and that Williams offered no evidence of what such an allowance should be. We therefore conclude that Williams has failed to carry the ultimate burden of persuasion by a preponderance of the evidence.

### B. The calculation of pipeline fees

156. Williams stated its request for relief from the Department's calculation of pipeline fees by presenting a spreadsheet calculation of its position on the correct calculation of taxes due. [Transcript Vol. III, pp. 483–494; Exhibit 155]. In this presentation and other testimony, Williams criticized various aspects of the auditors' calculations, including calculations of pipeline fees for MIGC and Fort Union. A statement of the taxpayer's position is not a demonstration that the Department's determination was incorrect. We conclude that the burden of proof remained with Williams.

157. In our Findings of Fact, we found that the auditors adjusted their calculations of the charges of MIGC to account for the MMBTU/MCF conversion. *Findings of Fact, ¶ 73.* We found that the monthly fixed fee schedule of Fort Union was not in effect in 1999. *Findings of Fact, ¶ 80.* We found that all parties accounted for pipeline fuel expense by deductions from gross volumes. *Findings of Fact, ¶ 75.* On the specific issues raised by Williams regarding the calculation of the transportation deduction, we conclude that Williams failed to carry the ultimate burden of persuasion by a preponderance of the evidence.

### C. Transportation fees downstream from Glenrock

158. Williams did not raise this issue of transportation deductions downstream from Glenrock until after the issuance of the final audit letter. *Findings of Fact, ¶¶ 77–78.* In doing so, Williams reversed Barrett's original and consistent position that the point of sale was Glenrock. *Findings of Fact, ¶ 19.* Barrett represented Glenrock as the point of sale at the commencement of the audit, and the auditors accepted this representation as fact. *Findings of Fact, ¶ 19.* By not shifting its position until its appeal was filed on September 23, 2002, Williams deprived the auditors of any reasonable opportunity to investigate the claim prior to issuing either preliminary or final audit findings.

159. In presenting its case at the hearing, Williams relied entirely on testimony from Storts regarding inconsistencies between the results of a state mineral royalty audit and the audit in this case. *Findings of Fact, ¶ 79.*

160. However, Storts was unable to provide satisfactory evidence of the relationship between sales prices purportedly received downstream and the claimed transportation costs. *Findings of Fact, ¶ 79.* In fact, Storts testified exclusively from his own inferences based on purported Barrett records; Williams produced no witness who could knowledgeably testify about the records from which Storts drew his inferences. *Findings of Fact, ¶¶ 21, 77.* Further, Williams did not call any witness to explain why Barrett had initially used Glenrock as its point of sale to determine both sales price and transportation costs. We conclude that Williams failed to carry the burden of showing that the Department determination is incorrect. The burden of proof remained with Williams.

161. During the Department's case, Simmons testified that the state royalty audit was conducted under different instructions than the tax audit. Specifically, the Office of State Lands and Investments gave the auditors different instructions than the Department of Revenue for the treatment of transportation expense beyond Glenrock. *Findings of Fact, ¶ 78.* Williams provided

no rebuttal to Simmons' explanation, which we add to the matters of fact that lead us to conclude that Williams did not meet its burden of persuasion. We also conclude as a matter of law that the policies of the Office of State Lands and Investments regarding royalty calculations cannot determine the application of the tax statutes. See *Kerr–McGee v. Wyo. Oil & Gas Conservation Commission,* 903 P.2d 537, 544–545 (Wyo. 1995).

162. The Board has been wary of taxpayer claims made too late to allow the Department to investigate before final taking action. See *Airtouch Communications, Inc., et al v. Department of Revenue, State of Wyoming,* 2003 WY 114, ¶¶ 52–55, 76 P.3d 342. A complete picture of natural gas transactions is essential if we are to reach the correct conclusions regarding application of Wyoming's tax statutes. E.g., *In the Matter of EOG Resources, Inc.,* Docket No. 2000–71 (2002 WL 1998583) (Wyo.St.Bd.Eq.). A taxpayer must come forward with full and satisfactory documentation of transactions supporting its claims. Williams has not. We conclude that Williams failed to carry its burden of persuasion by a preponderance of the evidence.

### Accrued Exempt Royalties

163. Williams contends that the Department failed to allow a deduction for certain exempt state royalties. Williams accrued certain exempt state royalties on its general ledger in a long-term liability account. *Findings of Fact,* ¶ 82. The Departments of Revenue and Audit refused to allow a deduction for those royalties because they are in dispute. *Findings of Fact,* ¶ 83.

164. Williams relies on a definition found in the Department regulations:

"Exempt royalty" means royalty expense, as determined on the accrual basis accounting in accordance with generally accepted accounting principles, for interests owned by the United States, the State of Wyoming, or an Indian tribe.

*Rules, Wyoming Department of Revenue, Chapter 6, Section 4(o).*

165. Williams points to its accrual, and contends that the definition dictates a deduction for Barrett. At a minimum, this ignores the word "expense," which contemplates more than a contingent obligation or an amount in dispute. Since the Department's construction is not either clearly erroneous or inconsistent with the plain meaning of the rule, we defer to the Department's construction. *Pinther v. State, Department of Administration and Information,* 866 P.2d 1300, 1302 (Wyo.1994). We therefore conclude that, as a matter of law, the Department was not obliged to allow a deduction for the exempt state royalties which have not been paid due to in dispute.

166. If the dispute is eventually resolved against Williams, and the exempt royalties are paid, Williams will have the remedy of a refund. *Wyo. Stat. Ann. § 39–14–209(c); Atlantic Richfield Company v. Board of County Commissioners of Sweetwater County,* 569 P.2d 1267 (Wyo.1977).

### Interest

167. Williams contends that "Barrett did not know and could not have known the tax liability was not paid in full when due." Amended Case Notice, ¶ A.8. The statute requires the payment of interest on delinquent taxes. *Wyo. Stat. Ann. § 39–14–208(c)(iv).* Taxes are delinquent "when a taxpayer or his agent knew or reasonably should have known that the total tax liability was not paid when due." *Wyo. Stat. Ann. § 39–14–208(c)(ii).*

168. On review the words and phrases used by Barrett personnel to describe their own facilities and those of Western, we find no grounds for the positions later taken by Williams, and by Storts. No Barrett employee characterized the booster compressor and glycol dehydrator as a processing facility, and no Barrett employee identified more than one dehydrator. *Findings of Fact,* ¶¶ 12–23. Barrett simply failed to apply the plain language of the statute.

169. No employee of Barrett or Williams requested of the Department either a written interpretation of the statute or a value determination. Both were available as a matter of right. *Wyo. Stat. Ann. § 39–14–209(a).* In-

stead, Storts was content to justify to himself Barrett's selection of a point of valuation. *Findings of Fact,* ¶¶ *27–31.*

170.   Williams has failed to carry its burden to show that the Department incorrectly required the payment of interest, or that Barrett did not know and could not have known the tax liability was not paid in full when due.

### ORDER

**WHEREFORE, IT IS HEREBY ORDERED** that: the determination of the Department of Revenue is hereby **affirmed.**

**Pursuant to Wyoming Statute Section 16–3–144 and Rule 12, Wyoming Rules of Appellate Procedure, any person aggrieved or adversely affected inn fact by this decision may seek judicial review in the appropriate district court by filing a petition for** **review within 30 days of the date of this decision.**

**Dated** this _____ day of November, 2003.

**STATE BOARD OF EQUALIZATION**

Roberta A. Coates, Chairman

Alan B. Minier, Vice–Chairman

Thomas R. Satterfield, Board Member

**ATTEST:**

Wendy J. Soto, Executive Secretary